William S. Helfand, #16686
Emily L. Rutter, #20000
**LEWIS BRISBOIS BISGAARD & SMITH** LLP
6550 South Millrock Drive, Suite 200
Salt Lake City, Utah 84121-2319
Telephone: 801.562.5555
Facsimile: 801.562.5510
Bill.Helfand@lewisbrisbois.com
Emily.Rutter@lewisbrisbois.com

*Attorneys for BMW Financial Services NA, LLC and Financial Services Vehicle Trust*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GAUGE AUTOMOTIVE, INC., <br><br> Plaintiff, <br><br> v. <br><br> BMW FINANCIAL SERVICES NA, LLC and FINANCIAL SERVICES VEHICLE TRUST, <br><br> Defendants. | **MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY, OR IN THE ALTERNATIVE RULE 64 MOTION FOR ATTACHMENT** <br><br> Civil No. 2:25-cv-00792-AMA-JCB <br><br> District Judge Ann Marie McIff Allen <br> Magistrate Judge Jared C. Bennett |
| BMW FINANCIAL SERVICES NA, LLC and FINANCIAL SERVICES VEHICLE TRUST, <br><br> Counterclaimant, <br><br> v. <br><br> GAUGE AUTOMOTIVE, INC., <br><br> Counter-Defendant. | |

Consistent with Federal Rules of Civil Procedure 65(a) and (b), BMW Financial Services

NA, LLC ("BMW") and Financial Services Vehicle Trust ("FSVT"), move for the entry of a

temporary restraining order, preliminary injunction, or alternatively for attachment under Rule 64, based on the following:

## **INTRODUCTION**

As the Court is aware, BMW and FSVT are the rightful owners of a certain, very valuable, 2023 Rolls-Royce Black Badge Cullinan, bearing vehicle identification number SLATV8C0XPU216487 (the "Vehicle"). The current projected value of the Vehicle is approximately $310,000-$314,000. Through or at least based on clearly fraudulent title activities, of which Plaintiff/Counter-Defendant Gauge Automotive, Inc. ("Gauge") was at least aware, if not complicit, purchased, sold, and re-purchased the Vehicle, which Gauge now possesses and is again attempting to sell for $337,980.00. Gauge has been on notice of Counterclaimants' actual ownership of the Vehicle, fraudulent title activities, and Counterclaimants' claim to the Vehicle since about April 2025. Indeed, as described in Counterclaimants' counterclaim [Dkt. 16], Gauge actively interfered with return of the Vehicle by a third-party, Florida Performance Cars, to Counterclaimants as the rightful owner of the Vehicle and has since sought to sell the Vehicle despite full knowledge that the vehicle title Gauge possesses was secured by fraud.

On October 3, 2025, the Court held a pretrial conference at which the Court acknowledged the disputed claims of ownership of the Vehicle and encouraged the parties to work together to provide a procedure where the Vehicle might be sold while securing the proceeds of sale for resolution of the disputed claims in this forum or the lawsuit pending in Florida state court in which Gauge is one of several defendants. Both during the hearing and then more emphatically afterward, Gauge's counsel has made clear that Gauge will not even attempt an agreement with Counterclaimants and that, to the contrary, Gauge intends to sell the Vehicle and keep, or more

likely dispose of, the proceeds of the sale without regard to Counterclaimants' claim of a right to the Vehicle or, alternatively, the proceeds of any sale.

Since, as the evidence shows, Gauge's total annual reported sales are a small fraction of the retail value of the Vehicle, and as Gauge's counsel advised the Court, Gauge is not willing to voluntarily enter into an agreement with Counterclaimants regarding the sale of the Vehicle, but instead intends to sell the Vehicle as soon as possible without regard to Counterclaimants' claims; such a sale, without a mechanism securing at least the proceeds of the sale, would impose irreparable harm to Counterclaimants, which the Court should preclude by extraordinary relief; either a temporary restraining order and subsequent injunction or by writ of attachment for the Vehicle or the proceeds of any sale of the Vehicle.

Counterclaimants request (1) a temporary restraining order preventing Gauge from selling the Vehicle without BMW's and FSVT's input and consent, which would include depositing the proceeds of any sale in the registry of the Court; (2) a hearing for a preliminary injunction to prevent the same until this matter is resolved; and (3) expedited discovery so the parties can prepare for a preliminary injunction; or (4) a writ of attachment, if the Court finds that a more appropriate means of effecting the same relief.

## RELEVANT BACKGROUND FACTS[1]

1.    The story of this vehicle began December 28, 2022, when a dealership in Miami, Florida (Braman Motors, Inc.) entered into a Motor Vehicle Lease Agreement (the "Lease") of Vehicle to Blackfire Transport LLC (a Florida company), whereby Blackfire Transport LLC leased the

---

[1] References to the evidence in support of this motion, which are in the Court's docket under Dkt. 11-1, *et. seq*. are incorporated here consistent with Rule 10, F.R.C.P.

Vehicle.[2] The Lease is clear that Florida law applies to the lease of the vehicle.[3] Braman Motors, Inc. immediately assigned the Lease to Rolls-Royce Motor Cars Financial Services, a division of BMW, which then assigned the Lease to FSVT.[4] FSVT is the title owner of the vehicle for the Florida Lease.[5]

2.      On or about April 2025, BMW discovered that fraudulent title activities occurred thereafter, resulting in Gauge believing it owned title to the Vehicle in early 2025.

3.      On or about March 4, 2025, JR Automotive, Inc. d/b/a Florida Performance Cars, LLC, a Florida limited liability company, purchased the Vehicle from Gauge for $314,000.[6] As alleged in the FPC Lawsuit, Gauge regularly solicited Florida Transactions with FPC, including selling/delivering as many as eleven (11) vehicle sales into Florida between November 2024 and June 2025 and advertising as many as fifty (50) vehicles into Florida since mid-2024.[7]

4.      Gauge delivered the Vehicle to FPC in Palm Beach County, Florida.[8] Shortly thereafter, Gauge transferred and delivered to FPC a certificate of title issued by the New York State Department of Motor Vehicles (the "NY Title") under fraudulent circumstances that showed no lienholder and made no disclosure of any title defect or outstanding encumbrance.[9]

---

[2] *See* Dkt. 11-1 at PageID.82.

[3] *Id.*

[4] *Id.*

[5] *See Id.* at PageID.89-9; *see also* Dkt. 11-2 at PageID.187 at ¶ 6.

[6] *See* Dkt 11-1 at PageID.100; PageID.114 at ¶ 21.

[7] *Id.* at PageID.113 at ¶¶ 12-13.

[8] *Id.* at PageID.114 at ¶ 22.

[9] *Id.* at PageID.98.

5.      BMW and FSVT discovered in 2025 that the Vehicle's title had been fraudulently re-titled, removing FSVT as the singular owner from the title chain, despite FSVT being owed hundreds of thousands of dollars and losing the ability to repossess its own collateral.[10] BMW/FSVT's investigation identified the Vehicle as being in FPC's possession.

6.      Shortly thereafter, BMW, acting as servicer for FSVT—Counterclaimants here—gave FPC formal notice that: (1) FSVT remains the lawful and record titleholder of the Vehicle, and (2) the Vehicle had been unlawfully and fraudulently retitled, such that FSVT's singular ownership was removed from the chain of title.[11]

7.      FPC conducted its own investigation and confirmed the fraudulent retitling scheme. Specifically, FPC's investigation revealed that, in December 2022, Braman Motors leased the Vehicle as a new car to Blackfire Transport LLC, with FSVT as owner/lessor and lienholder.[12] However, sometime in or around August 2024, an individual named Steven J. Calderon presented to the New York State Department of Motor Vehicles a forged and fraudulent Florida Certificate of Title for the Vehicle, allegedly issued on January 20, 2023 (the same date the valid Florida Title was issued), and listing a Manuel Calderon as the registered owner (the "Fraud Title").[13]

8.      Upon presentation of the Fraud Title to the New York State Department of Motor Vehicles, that entity issued the above-mentioned New York State Certificate of Title to Steven J. Calderon under the false veneer of being free and clear of any liens or encumbrances.[14]  Steven J. Calderon then sold

---

[10] *Id.* at PageID.109; *see also* Dkt. 11-2 at PageID.187-188 at ¶¶ 8-10.

[11] *See* Dkt. 11-1 at PageID.93; *see also* Dkt. 11-2 at PageID.188 at ¶ 11.

[12] *See* Dkt. 11-1 at PageID.81-91.

[13] *Id.* at PageID.95-96.

[14] *Id.* at PageID.98-99.

the Vehicle to Gauge, transferring the NY Title to Gauge.[15]  In turn, Gauge transferred the fraudulent NY Title to FPC.[16]

9.      On October 3, 2025, Gauge's counsel informed this Court that Gauge purchased the Vehicle from Mr. Calderon for $310,000 and sold it to FPC for $314,000—only a $4,000 profit on such a unique and valuable vehicle.

10.     The title and transaction history from the Florida Department of Highway Safety and Motor Vehicles confirms that no Florida Certificate of Title was ever issued to Manuel Calderon. In addition, an investigator from the Florida Department of Highway Safety and Motor Vehicles, Jessica Jimenez, confirmed the illegitimate nature of the Fraud Title, noting "Definitely a fraudulent Florida title....They didn't even try to make it look legit."[17] As a result, the Fraud Title was invalid and void as a matter of law.

11.     While it is presently unclear the extent to which Gauge—Counter-Defendant here—was aware of the secret title-fraud activities, no one can dispute that Gauge knew of the title-fraud before July 2025, because FPC notified Gauge of the fraud via the FPC Lawsuit in Florida.[18]  Stated simply, prior to Gauge taking possession of the Vehicle and filing this lawsuit, Gauge was fully informed that (1) the NY Title was fake and invalid as a matter of law; (2) that FSVT is the rightful owner of the Vehicle with FSVT/BMW holding valid title over the Vehicle; and (3) that FPC considered Gauge to have engaged in misconduct by selling the Vehicle to FPC.[19]

---

[15] *Id.*

[16] *Id.*

[17] *Id.* at PageID.109; *see also* Dkt. 11-2 at PageID.188 at ¶ 12.

[18] *See* Dkt. 11-1 at PageID.110-129.

[19] *Id.* at PageID.116 at ¶¶ 34-40.

12.      Gauge was the Defendant in the first-filed FPC Lawsuit involving the same Vehicle and the same parties, in which Counterclaimants here intervened.[20]  FPC voluntarily dismissed the FPC Lawsuit on July 21, 2025, prior to the Florida court ruling on FSVT's and BMW's motion to intervene, and after Gauge agreed to "'unwind' the vehicle sale and to indemnify FPC against any future claims."[21] Of course, the agreement between FPC and Gauge purposefully thwarted FSVT's and BMW's intervention to assert FSVT's and BMW's rights as the rightful owner of the Vehicle.

13.      As part of Gauge's plan, rather than continue the existing Florida litigation or awaiting BMW/FSVT's impending lawsuit against FPC and Gauge in Florida, Gauge rushed to file this suit in Utah state court, despite the fact *no activity* involving the Vehicle has occurred in Utah and none of the Defendants/Counterclaimants are residents of Utah.

14.      Indeed, just as Gauge anticipated, FSVT and BMW filed the BMW Lawsuit on August 8, 2025, in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.[22] The BMW Lawsuit is pending and FSVT's and BMW's allegations and claims are similar to those presented in this action, including claims for declaratory relief, replevin, conversion, unjust enrichment, breach of contract, and trespass of chattels in connection with the same subject Vehicle.[23]  In short, the BMW Lawsuit in Florida will resolve the ultimate questions underlying both the instant lawsuit and the BMW Lawsuit—whether title fraud occurred relative to this Florida titled Vehicle, how it occurred, whether that Florida title remains the only valid title to the

---

[20] *Id.* at PageID.76 at ¶¶30-34; PageID.110-157.

[21] *Id.* at PageID.75 at ¶36; PageID.159.

[22] *Id* at PageID.69-80.

[23] *Id.*

Vehicle, and whether BMW/FSVT are entitled to ownership and immediate possession of this valuable Vehicle.

15.     On October 3, 2025, this Court held a pretrial conference to discuss the parties working together to come up with a procedure whereby the Vehicle could be sold in order to (1) preserve the present value of the Vehicle; (2) avoid depreciation of the Vehicle during the pendency of this and the Florida matters; and (3) deposit the sale funds with the court for preservation through final adjudication.

16.     While Counterclaimants are amenable to a joint solution to sell the Vehicle in a "commercially reasonable manner" to comply with the language of the still valid lease agreement and with State law, Gauge's counsel stated that Gauge is planning to sell the Vehicle without regard to Counterclaimants' claims. Whether Gauge intends to do so, a continuation of a fraud in which it is becoming increasingly apparent Gauge is an active participant or, at best, an innocent victim itself is immaterial to the immediate need to secure either the Vehicle or the proceeds of any unilateral sale, to avoid irreparable harm to Counterclaimants.

17.     Upon learning of a potentially imminent sale, Counterclaimants sent a letter to Gauge's counsel informing Gauge that Counterclaimants believe the parties could "come to a mutual agreement for a commercially reasonable sale of the vehicle [and] deposit of the proceeds with the court pending resolution of all claims," but if Gauge "continues down this path to sell the subject vehicle without prior agreement and input from BMW, Gauge must notify the potential purchaser that (1) there is a clouded title with BMW asserting claim to the vehicle as the actual owner; (2) they will be subject to a lawsuit; and (3) the vehicle is subject to repossession by BMW under the

valid lease agreement.  Moreover, if Gauge sells the subject vehicle without Counterclaimants' approval, Gauge may be subject to sanctions for spoliation of the evidence."[24]

18.    Counterclaimants further informed Gauge that Counterclaimants  would have no choice but to file a request for temporary restraining order if Gauge was unwilling to cooperate.[25]

19.    Gauge's counsel has affirmatively confirmed that Gauge is unwilling to cooperate with Counterclaimants to address Counterclaimants' claim of ownership of the Vehicle or proceeds of sale.[26]

20.    Gauge intends to sell the Vehicle without regard to Counterclaimants' claim or the Court's suggestion of an agreement to avoid the very irreparable harm Gauge appears to intend.

21.    On Saturday, October 4, 2025, the subject Vehicle was listed for sale by Secured Auto Group ("SAG") for $337,980.00, and was still listed as available on Monday, October 6, 2025.[27] The Vehicle was no longer available on SAG's website as of Tuesday, October 7, 2025, and was listed as "Sold" on October 8, 2025.[28]

## ARGUMENT

### I.    Standard for Temporary Restraining Order and Preliminary Injunction.

To obtain a temporary restraining order or preliminary injunction,[29] Counterclaimants must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm if the injunction is

---

[24] See Dkt. 16-1 at PageID.207-209.

[25] Id.

[26] See Dkt. 16-2 at PageID.210-212.

[27] See Dkt. 16-3 at PageID.213-219.

[28] Id.

[29] AAAG-California, LCC v. Kisana, 2020 WL 278879, at *2 (D. Utah Jan. 19, 2020) (legal standard for TRO and preliminary injunction is the same).

denied; (3) the threatened injury outweighs the harms that the TRO or injunction may cause the non-movant; and (4) the TRO or injunction, if issued, will not adversely affect the public interest.[30] "[T]he very purpose of an injunction under Rule 65(a) is to give temporary relief based on a preliminary estimate of the strength of the plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case".[31] Therefore, a movant "must present a prima facie case but need not show a certainty of winning."[32] "The purpose of a preliminary injunction is not to remedy past harm but to protect movants from irreparable injury that will surely result without their issuance."[33] "The movant must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages."[34]

## II.    Counterclaimants Have A Substantial Likelihood of Prevailing on the Merits of Their Claim.

Most of the facts of this matter are undisputed.  For example, it is undisputed that FSVT is the title owner of the vehicle under the original sale and Florida Lease. It is also undisputed that fraudulent title activities occurred thereby resulting in a fraudulent Florida title being created removing FSVT as the title owner. Furthermore, it is undisputed that a New York title was issued from the fraudulent Florida title and that Gauge purchased the Vehicle from Steven J. Calderon under the false veneer of being free and clear of any liens or encumbrances. It is further undisputed Gauge in turn transferred the NY Title to FPC.  Lastly, it is undisputed that Gauge then purchased

---

[30] *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020).

[31] *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1273 (10th Cir. 2018) (internal quotation marks and citation omitted).

[32] *Id.* (internal quotation marks and citation omitted).

[33] *Id.* at 1270 (internal quotation marks and citation omitted).

[34] *Id.* (internal quotation marks and citations omitted).

164499525.5

the Vehicle from FPC with full knowledge of the clouded title. The questions before the Court as to the likelihood of prevailing, are who holds valid title ownership and thus has the right to sell the Vehicle and receive the proceeds from the sale, and whether Gauge acted unlawfully by retaking and reselling the Vehicle with full knowledge that only FSVT owned the Vehicle?

When evaluating the valid vehicle title and subsequent ownership, Utah law reinforces the principle that fraudulent or defective titles cannot convey valid ownership.[35] Under U.C.A. 1953 § 41-1a-109, the Utah Motor Vehicle Division is required to refuse the registration or issuance of a certificate of title, or any transfer of registration, if the application contains false or fraudulent statements or if the division has reasonable grounds to believe that the vehicle is stolen or that granting the title would constitute fraud against the rightful owner or lienholder. This statutory mandate ensures that fraudulent titles cannot facilitate the transfer of ownership, thereby protecting the interests of rightful owners and lienholders. Furthermore, 18 U.S.C.A § 2314 provides that the transportation of falsely made securities, including vehicle titles, in interstate commerce, is broadly prohibited, and fraudulent conduct precludes the transfer of valid title.

While Gauge might have made a colorable argument of ignorance of the fraud found by the State of Florida as to title to the Vehicle when Gauge first bought the Vehicle from Sandoval, Gauge thereafter elected to repurchase the Vehicle from FPC after having become fully aware of the fraudulent Florida and resulting fraudulent New York title documents. Accordingly, under the Utah Supreme Court's holding in *Swartz,* Gauge cannot claim to be an innocent purchaser of the Vehicle from FPC, since Gauge not only purchased the Vehicle from FPC with full knowledge of

---

[35] *See Swartz v. White*, 80 Utah 150 (1932)

the prior fraudulent title, but also actively encouraged—indeed compensated—FPC to not return the Vehicle to Counterclaimants, as FPC had previously agreed.

Under Florida law, where the initial fraud transpired, fraudulent representations in obtaining a vehicle title render the title void *ab initio*. In *Southeast First Nat. Bank of Miami v. Security Peoples Trust Co.*, the court held that a defective title certificate obtained through false representations could not defeat recovery of the vehicle by the true owner. The court emphasized that the title never passed to the fraudulent party, and thus, there was no valid basis for applying for a certificate of title.[36] Similarly, in *Swartz v. White,* the Supreme Court of Utah held that a person who deceptively obtained a vehicle and its certificate of ownership through larceny by trick could not convey title to another party. Furthermore, the Utah Supreme Court held that prospective buyers are required to make reasonable inquiries into the ownership and title of vehicles and failure to do so precludes them from being considered bona fide purchasers.[37]

Here, Gauge purchased the Vehicle from Mr. Steven J. Calderon who acquired the vehicle from Mr. Manuel Calderon under a fraudulent Florida title representation. The evidence shows the Florida title is void ab initio and the transfer to Mr. Steven Calderon is invalid making the subsequent New York title and transfer to Gauge also fraudulent and invalid. Even if Gauge claims to be a bona fide purchaser, Gauge cannot show it made "reasonable inquiries into the ownership and title" before it purchased the Vehicle from Mr. Steven Calderon. Gauge's counsel admitted in Court that it purchased and sold the Vehicle on the same day. All Gauge did was sign the New

---

[36] *See Se. First Nat. Bank of Miami v. Sec. Peoples Tr. Co.*, 480 F. Supp. 1345, 1348 (W.D. Pa. 1979).

[37] *See Heaston v. Martinez*, 3 Utah 2d 259, 264 (1955).

York title over to itself through a power of attorney, and then immediately sign the title over to Florida Performance Cars. Notably as well, Gauge did not attempt to title the Vehicle in Utah likely due to the fact that Utah law prohibits titling a vehicle when doing so "would constitute fraud against the rightful owner or lienholder."

Again, even if Gauge can claim to be a bona fide purchaser from Mr. Steven Calderon, it cannot do so as to Gauge's purchase of the Vehicle from FPC. Counterclaimants notified FPC of Counterclaimants' ownership of the Vehicle and the title fraud as early as April 16, 2025, and FPC notified Gauge of the same before filing suit against Gauge on June 23, 2025,[38] all before Gauge chose to buy the Vehicle from FPC to, at the very least, interfere with FPC's agreement to return the Vehicle to its rightful owner; Counterclaimants. To be sure, Counterclaimants also notified Gauge of Counterclaimants' ownership and the titled fraud through a motion to intervene in the Florida case.[39] Only after all that, Gauge purchased the subject Vehicle from FPC with full knowledge of an invalid fraudulent title. These essentially undisputed facts demonstrate a substantial likelihood that Counterclaimants will prevail on the merits of their Counterclaims.

## III. Counterclaimants Will Suffer Irreparable Harm if a Sale of the Vehicle is Allowed Without Counterclaimants' Input, and the Funds not Deposited in the Court.

Counterclaimants seek a TRO, and subsequently a preliminary injunction, on Gauge's claim to valid title in order to sell the subject Vehicle, and to prevent Gauge from selling this unique Black Badge Rolls-Royce without Counterclaimants' agreement until a mutually agreed and commercially reasonable sales process has been established either between the parties or by

---

[38] *See* Dkt. 11-1 at PageID.73-74 at ¶¶ 26-30.

[39] *Id.* at PageID.74 at ¶¶ 33-34.

the Court, with the proceeds of the sale secured in the registry of the Court pending resolution of all claims. Counterclaimants attempted to intervene in FPC's Florida suit against Gauge so that Defendant could recover its unique asset, which Gauge actively frustrated by buying the Vehicle from FPC and promising to indemnify FPC[40] against future suit by Counterclaimants, thus perpetuating Counterclaimants' harm.

Normally, payment of money is not considered irreparable, but that is because "money can usually be recovered from the person to whom it is paid," but to the extent the harm involves expending money or resources, "[i]f those expenditures cannot be recouped, the resulting loss may be irreparable."[41] "Difficulty in collecting a damage judgment may support a claim of irreparable injury."[42] An "injury may be irreparable if [Gauge] will be financially unable to pay damages."[43] If Counterclaimants "cannot collect a money judgment, then failure to enter the preliminary injunction would irreparably harm [them]."[44] The evidence, including admissions by Gauge's own counsel, show that collection of a damage award in excess of $300,000 – the approximate value of the Vehicle – is almost certainly unlikely.

---

[40] A dubious promise for a company that reports total annual sales of less than one-third of the value of the Vehicle.

[41] See *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304, 131 S.Ct. 1, 177 L.Ed.2d 1040 (2010) (Scalia, J., in chambers); *National Urban League v. Ross*, 484 F.Supp.3d 802 (2020).

[42] See *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986);

[43] See *Central States, Southeast & Southwest Areas Pension Fund v. Jack Cole-Dixie Highway Co.*, 642 F.2d 1122 (8th Cir.1981)

[44] See *Tri-State Generation*, 805 F.2d at 355.

Gauge is a small, independent company which acts as a facilitator for independent car sales, connecting sellers and buyers. Gauge relies on quick sales for minimal profits.[45] They are a "low-margin, high-volume company" who only makes "a small transaction fee (typically a few hundred bucks)" because Gauge focuses on providing "a great price and a great experience" rather than "high profit margins."[46] Gauge "only make[s] money when [the seller] make[s] money."[47] A Dun & Bradstreet record report indicates that Gauge's annual sales is only $100,000.[48]

If Gauge is permitted to sell the Vehicle without Counterclaimants' agreement or a court order requiring the proceeds to be deposited with the Court – both options Gauge has refused - Counterclaimants will suffer a significant loss. The price of this unique Vehicle is more than three-times Gauge's reported annual sales. Based on that indisputable fact alone, there is a strong likelihood that Counterclaimants will not be able to collect on a judgment against Gauge. Additionally, Gauge has already agreed to indemnify one other defendant, FPC, in the Florida lawsuit, and there is nothing stopping Gauge from indemnifying a subsequent purchaser in order to facilitate another quick sell of the Vehicle, like it did with FPC, in a noncommercially reasonable manner, simply to offload the Vehicle it knows has a clouded title and is tied up in litigation in two states. The sale of the Vehicle would change purported ownership of the Vehicle which would then require Counterclaimants to bring yet another party into the various lawsuits already

---

[45] Relv. Facts ¶ 9.

[46] sellgauge.com – We only make money when you make money

[47] *Id.*

[48] *See* Exhibit A – A Dun & Bradstreet record report is a global comprehensive business credit report with a profile that provides detailed information about a company's financial health, payment history, and potential risks.

underway.  And if that purchaser then resells again (which frequently happens in these instances of fraudulent title transfers), the knot becomes bigger and bigger and more difficult and costly to unwind.

Furthermore, if this Vehicle is sold in a noncommercially reasonable manner, it would impair Counterclaimants' efforts to seek damages from Blackfire under the Florida Lease Agreement, which requires any sale to be commercially reasonable in order to recover damages. Should the subject Vehicle be sold without a court order requiring all proceeds be deposited with the Court, there is nothing stopping Gauge from reinvesting those funds into another facilitated car purchase, as is their business model, or even declaring bankruptcy to prevent Counterclaimants' ability to collect any judgment, thereby thwarting all of Counterclaimants' efforts to not only recover monetary damages from Gauge, and likely Blackfire, but Counterclaimants would also lose the unique Black Badge collateral which would provide means to mitigating Counterclaimants' damages.

## IV.    The Threatened Injury Outweighs the Harm a Temporary Restraining Order or Injunction may Cause Gauge.

Because Gauge can always sell the Vehicle or return it to Counterclaimants who will make a commercially appropriate sale of the Vehicle and submit the proceeds of any sale into the registry of the Court, Gauge will suffer either minimal or no harm if the Court grants the requested injunctive relief, compared to injury Counterclaimants face. Gauge will still have the opportunity to recover damages, if any to which Gauge may be adjudged entitled after adjudication of the parties' respective claims.  Moreover, if Gauge retains the Vehicle and is simply enjoined from selling the Vehicle to avoid irreparable harm to Counterclaimants pending resolution of this matter, Gauge's collateral will not be impaired. Simply put, Gauge does not face any immediate harm due

to the temporary restraining order. However, as discussed here, if the Court does not restrain and enjoin Gauge, Gauge's sale of the Vehicle will be a sale of Counterclaimants' property, purported ownership will change, Counterclaimants will be required to join yet another party to the two pending lawsuits, and if the sale is noncommercially reasonable, it will impair Counterclaimants' efforts to recover damages from Blackfire in accordance with the original Florida Lease, and, according to Gauge the proceeds of sale will likely be lost to execution.

## V.    A Temporary Restraining Order and Subsequent Preliminary Injunction Will Not Adversely Affect the Public Interest.

The TRO or injunction, if issued, will not adversely affect the public interest.  On the contrary, it will protect public interest.  The parties' dispute who rightfully holds valid title to the Vehicle and thereby has a right to sell the Vehicle and benefit from the proceeds.  If Gauge is not estopped from selling the vehicle, Gauge will not notify a subsequent purchaser of the clouded title, that the subsequent purchaser will be subject to the lawsuit(s) currently pending, and that the Vehicle is also subject to repossession by BMW under the valid lease agreement.  Particularly, since Gauge's contact and transactions with Steven J. Calderon and FPC initiated Counterclaimants' understanding of the fraudulent title activity, Counterclaimants need the opportunity to conduct discovery and have this matter determined on its merits.  Furthermore, the subject Vehicle is currently listed for sale through SAG, necessitating discovery as to Gauge's dealings and connections with SAG. Thus, granting the parties time to conduct discovery by maintaining the status quo subserves the public interest of resolution of disputes based on due process and evidence before more harm comes to unsuspecting purchasers.

164499525.5

## VI.    Counterclaimants' Counsel Provided Notice to Gauge's Counsel Regarding the Rightful Ownership of the Vehicle.

Although not required for preliminary injunctions, Federal Rule of Civil Procedure 65(b)(1)(B) requires that Movant's counsel must certify in writing any efforts made to give notice and the reasons why it should not be required.[49]

On October 3, 2025, Defense counsel sent Gauge correspondence stating why the sale of the subject vehicle was improper and requested that Gauge halt any pending sale, or Gauge must notify the potential purchaser that (1) there is a clouded title with BMW asserting claim to the vehicle as the actual owner; (2) they will be subject to a lawsuit; and (3) the vehicle is subject to repossession by BMW under the valid lease agreement.[50] Gauge has made abundantly clear that Gauge refuses to cooperate and will sell, or maybe has sold, the Vehicle without regard to Counterclaimants' claim of ownership.[51]

## VII.    Gauge Already Has Security Under Rule 65(c).

For a Court to issue a temporary restraining order, not a preliminary injunction, it may do so "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[52] Since Gauge currently holds possession of the subject Vehicle at issue in this matter, Gauge's alleged debt is already secured and no additional security is necessary.

---

[49] Fed. R. Civ. P. 65(b)(1)(B).

[50] *See* Dkt. 16-1 at PageID.207-209.

[51] *See* Dkt. 16-2 at PageID.210-212; Dkt. 16-3 at PageID.213-219.

[52] Fed. R. Civ. P. 65(c).

164499525.5

## VIII.  Counterclaimants' Request for Expedited Discovery.

In conjunction with this request for a TRO and the hearing on a preliminary injunction, Counterclaimants request expedited discovery so the parties may present evidence at a hearing on a preliminary injunction.  Specifically, Counterclaimants seek discovery, in the form of ten interrogatories, fifteen requests for production, and a deposition of no more than four hours of a corporate representative for Gauge, all of which should be completed on an expedited basis to allow Counterclaimants to prepare for a preliminary injunction hearing, as to all of Gauge's communications and interactions with Mr. Steven Calderon and FPC and any contracts and agreements between those parties, any communications Gauge has had with SAG in connection with the subject Vehicle and any contracts and agreements between those parties, any communications, contracts, and agreements in relation to the subject Vehicle, the past and potential sale(s) of the subject Vehicle, and the identity of and communications with any potential purchaser of the Vehicle or individuals who may have further information pertaining to the Vehicle, its sale(s), and the fraudulent activities associated with the subject Vehicle. Finally, Counterclaimants seek Gauge's accounting records for solvency purposes. This information is, obviously, necessary for Counterclaimants to be able to prove who had knowledge of what and when, and whether Gauge is in any way complicit with the fraudulent activity surrounding this Vehicle.

## ALTERNATIVE RULE 64 MOTION FOR ATTACHMENT

Alternatively, Counterclaimants move the Court for a prejudgment writ of attachment against the Vehicle or alternatively the proceeds of any sale of the Vehicle by Guage.  Fed. R. Civ. P. 64, authorizes the Court to apply Utah law to issue a prejudgment writ of attachment. Under  Rules 64A and 64C of the Utah Rules of Civil Procedure, a writ of attachment is warranted

when (1) "the property [to be attached] is not earnings and not exempt from execution;" (2) "the writ is not sought to hinder, delay or defraud a creditor of the defendant;" (3) there is "a substantial likelihood that the plaintiff will prevail on the merits of the underlying claim;" (4) "the defendant is indebted to the plaintiff;" (5) "the action is upon a contract or is against a defendant who is not a resident of this state or is against a foreign corporation not qualified to do business in this state or the writ is authorized by statute;" and (6) "payment of the claim has not been secured by a lien upon property in this state."[53]  All of these conditions permit attachment of the Vehicle or proceed of the sale of the Vehicle.

Additionally, "movant must satisfy at least one of the seven requirements listed in Rule 64A(c)(4) through (c)(10), with applicable ones being "the defendant has assigned, disposed or concealed, or is about to assign, dispose of or conceal, the property with intent to defraud creditors; or . . . the defendant has fraudulently incurred the obligation that is the subject of the action; or the property will materially decline in value; or that the plaintiff has ownership or special interest in the property; or probable cause of losing the remedy unless the court issues the writ."[54]

Here, Counterclaimants seek the attachment to prevent further fraud perpetuated against Counterclaimants in a fraudulent title scheme surrounding the Vehicle.[55] Counterclaimants have an ownership interest in the Vehicle.[56] Based on representations made by Gauge's counsel to the Court and FSVT's counsel, Gauge either has the Vehicle, has sold the Vehicle, or is attempting to

---

[53] *See First Guar. Bank v. Republic Bank, Inc.*, 303 F. Supp. 3d 1200, 1204 (D. Utah 2017).

[54] Rule 64A(c)(5), (c)(7) – (c)(10)

[55] *See* Exhibit B – Affidavit of Steven Forry at ¶¶ 4-5.

[56] *Id.* at ¶ 4.

make an immediate sale of the Vehicle,[57] with no plans or willingness to secure the proceeds of any disposition of the Vehicle to allow the Court to adjudge any parties' entitlement to the Vehicle or sale proceeds of the Vehicle.

The last known location of the Vehicle was at Secured Auto Group, 4339 S. State Street, Salt Lake City, Utah 84107, where it was listed for sale at $337,980.00.[58] The nature of a vehicle is such that it will continually decline in value, and without an attachment of the Vehicle, or funds from the sale of the Vehicle, there is probable cause Counterclaimants will lose any remedy. Counterclaimants have not otherwise secured payment of the claim by a lien upon property in this state, but as explained above, there is a substantial likelihood that Counterclaimants will prevail on the merits of their underlying claim. Gauge's actions have tortiously interfered with the contract between Counterclaimants and its Lessees, Blackfire Transport, LLC and Alfred Davis, and as such, Gauge is indebted to Counterclaimants for said contractual interference and for its tortious interference with FPC's contract with Counterclaimants to surrender and return the Vehicle to its rightful owner, FSVT.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Counterclaimants respectfully request that this Court (i) grant their Motion for Temporary Restraining Order, (ii) schedule a hearing for a Preliminary Injunction, and (iii) grant Counterclaimants' request for  discovery, or (iv) in the alternative under Rule 64, grant a prejudgment writ of attachment and either attach the Vehicle or proceeds from the sale of the Vehicle pending the adjudication of this matter.  Counterclaimants

---

[57] *Id.* at ¶ 7.

[58] *Id.* at ¶ 6.

further pray that the Court grant them such other and further relief, at law or in equity, to which they may be justly entitled.

Counterclaimants respectfully request oral argument on this matter.

DATED: October 10, 2025            LEWIS BRISBOIS BISGAARD & SMITH LLP

By:  /s/ Emily L. Rutter
     William S. Helfand
     Emily L. Rutter
     *Attorneys for BMW Financial Services NA, LLC*
     *and Financial Services Vehicle Trust*


## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of October, 2025, I caused a true and correct copy of the foregoing **MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY, OR IN THE ALTERNATIVE RULE 64 MOTION FOR ATTACHMENT** to be electronically filed through the Court's CM/ECF system, which will send notification of such filing to the following:

Chad Pehrson
KBA
50 W. Broadway, 10th Floor
Salt Lake City, Utah 84101
cpehrson@kba.law
*Attorneys for Plaintiff*
*and Counter-Defendant*

                    /s/ Emily L. Rutter