CHAD PEHRSON (12622)
KBA
50 West Broadway
Salt Lake City, UT 84101
(801) 994-4646
CPEHRSON@KBA.LAW

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
NORTHERN DIVISION

| | |
|---|---|
| GAUGE AUTOMOTIVE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BMW FINANCIAL SERVICES NA, LLC and<br><br>FINANCIAL SERVICES VEHICLE TRUST,<br><br>Defendants. | PLAINTIFF GAUGE'S OPPOSITION TO BMW'S MOTION FOR TRO<br><br>Case No. 2:25-cv-00792<br><br>Judge Ann Marie McIff Allen<br><br>Jury Demanded |

Gauge respectfully submits this Opposition to Defendants' Motion for Temporary Restraining Order and Preliminary Injunction.

## INTRODUCTION

BMW FS seek extraordinary equitable relief—but their motion is untimely, legally defective, and factually moot. The vehicle at the heart of this case, a 2023 Rolls-Royce Cullinan, has already been sold by Plaintiff Gauge Automotive, Inc. ("Gauge") to a third party for value, and is no longer in Gauge's possession. This alone renders the core request—to enjoin a sale—entirely moot.  Even if the motion were not moot, BMW FS seeks an unprecedented remedy: to force a small, law-abiding business to deposit over $300,000 in proceeds with the Court, absent

any judgment, trial, or persuasive showing of entitlement. There is no legal basis for such a demand. Rule 65 does not authorize freezing assets in anticipation of a potential money judgment, and Rule 64's attachment remedies require statutory compliance that BMW FS has not even attempted. Their request amounts to a pre-judgment seizure of funds without process—a result plainly at odds with constitutional and procedural norms.

Further, BMW FS's purported predicament stems from its own lack of diligence. By its own admission, BMW FS lost control of this vehicle years ago. BMW FS failed to timely recover the vehicle from a lessee in default, failed to monitor title records or correct the record or notify authorities, and then failed to act promptly even after learning that the vehicle had passed into the stream of commerce. Gauge, by contrast, acquired the vehicle in good faith, for fair value, relying on a clean New York title showing no liens. It appropriately sold the vehicle to another bona fide purchaser. At every step, Gauge acted transparently and within the law.

In short, BMW FS entrusted its asset to a bad actor and then slept on its rights. Now, having allowed the vehicle to pass through multiple hands, BMW FS seeks to shift the consequences of its own inaction onto an innocent business. This Court should decline that invitation. The vehicle has been sold. The core relief sought in the motion is moot. And the extraordinary relief of a deposit, which BMW FS also demands, is neither lawful nor equitable.

## ARGUMENT

### I. The Request to Enjoin Sale or Transfer of the Vehicle is Moot (No Live Controversy to Enjoin)

An injunction is meant to prevent future or ongoing harm, not to address a fait accompli. Here, the core injunctive relief initially sought by BMW FS – an order prohibiting Gauge from selling, transferring, or encumbering the Rolls-Royce – has been overtaken by events. Gauge already sold the vehicle on October 7, 2025. That transaction is complete. No preliminary court

**Opposition to BMW's Motion for TRO.**                                              **Page 2**

order can rewind that sale or make it un-happen; the vehicle is gone from Gauge's possession. Courts routinely decline to issue (or maintain) injunctions when the actions to be enjoined have occurred, rendering the matter *moot*. As one court put it, once the property has been sold, a request to enjoin the sale presents no live controversy – the court "cannot grant any effective relief because [it] can no longer enjoin the sale." *Farm Credit Bank of Spokane v. Booher*, 19 F.3d 1440, at *1 (9th Cir. 1994).

In this case, since the sale has already occurred, an injunction against sale would be futile. There is no "irreparable harm" to prevent via injunction – the vehicle is not in danger of being sold; it *has been* sold. This Court cannot enjoin Gauge from doing something it has already done. Nor can the Court enjoin the third-party buyer (Secured Auto Group) within the scope of this motion, as that entity is not a party to the case. In short, this aspect of BMW FS's motion is moot.

BMW FS may argue that the Court could still issue relief by targeting the proceeds of the sale, thereby indirectly addressing the completed sale. But that is a fundamentally different injunction than originally requested, and it raises the separate legal issues discussed below. What matters for mootness is that the originally requested injunctive relief (blocking a sale) is no longer applicable. A TRO or preliminary injunction "limited to cases that present a real possibility of future harm" cannot be granted when the event sought to be prevented has already occurred.

## II. There Is No Legal Basis for a Pre-Judgment Asset Freeze or Deposit of Sale Proceeds

BMW FS's motion—seeking to immobilize $324,000 of Gauge's funds before any adjudication of rights—is, in substance, a request for a prejudgment attachment. That remedy is neither authorized by the Federal Rules nor permissible under controlling precedent.

**A. Rule 65 Does Not Permit an Asset Freeze to Secure a Money-Damages Claim**

A preliminary injunction preserves the status quo to ensure effective final relief. It is not a mechanism to secure payment of a disputed debt. The Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), is dispositive. There, an unsecured creditor sought to restrain a debtor's assets pending judgment on a contract claim. The Court held the district court "lacked authority to issue a preliminary injunction preventing [defendants] from disposing of their assets pending adjudication" of a money-damages claim. *Id.* at 333. Such a restraint was "historically unavailable in equity" and thus beyond a federal court's power under Rule 65. *Id.* at 319–22.

The same reasoning controls here. BMW FS's counterclaims seek only monetary relief—the value of the vehicle or equivalent damages. It claims no equitable title, lien, or ownership in Gauge's general assets or the sale proceeds. Without a recognized equitable interest in specific, traceable property, the Court lacks authority to freeze assets pre-judgment. *See De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220–23 (1945). Granting BMW FS's request would give it the very security it could obtain only after prevailing on the merits—exactly what *Grupo Mexicano* forbids.

**B. Rule 64 and Utah Law Provide the Exclusive Path for Prejudgment Seizure—and BMW FS Ignored It**

Rule 64 allows a plaintiff to invoke state-law remedies such as attachment or replevin "as provided by the law of the state where the court is located." *Fed. R. Civ. P.* 64(a). Those remedies require a motion, sworn affidavit, and bond, and are available only upon proof of specific statutory grounds (e.g., concealment or fraud). BMW FS has not filed such a motion, posted security, or identified any qualifying ground under Utah R. Civ. P. 64A.  Nor could it meet those standards. BMW FS knew for months that Gauge and Florida Performance Cars

rescinded the earlier sale, yet it never pursued a lawful writ in this Court. The vehicle has since

been converted into ordinary sale proceeds, not a segregated fund. Compelling Gauge to deposit

those proceeds would be an impermissible asset freeze for a disputed debt—precisely the result

*Grupo Mexicano* prohibits. *See* id. at 333–34.

Rule 65 cannot be used to sidestep Rule 64. Because BMW FS has shown neither an

equitable property interest nor compliance with the procedures for attachment, its motion must

be denied. *See Fed. R. Civ. P.* 64–65; *De Beers*, 325 U.S. at 220–23.

### C. A Prejudgment Asset Restraint Would Violate Due-Process Principles

Even apart from the rules, the Constitution forbids depriving a party of property without

adequate process. *See Fuentes v. Shevin*, 407 U.S. 67 (1972); *Sniadach v. Family Fin. Corp.*, 395

U.S. 337 (1969); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975);

*Connecticut v. Doehr*, 501 U.S. 1 (1991). These decisions hold that prejudgment seizures of

property are unconstitutional unless the plaintiff first provides notice, an opportunity to be heard,

a supporting affidavit, and a bond—and demonstrates extraordinary circumstances.

Applying the *Mathews v. Eldridge*, 424 U.S. 319 (1976), balancing test, each factor weighs

heavily against BMW FS. Gauge's interest in its own funds is paramount; the risk of erroneous

deprivation is high given BMW FS's disputed claims; and BMW FS faces no imminent harm—

its concern is only that it may later be unable to collect a money judgment. That is not a

constitutionally sufficient justification for a prejudgment freeze, especially where BMW FS

delayed for months before seeking relief.

In short, prejudgment restraints on property are "extraordinary remedies" available only

through narrowly defined procedures. *Grupo Mexicano*, 527 U.S. at 321–23. BMW FS has

shown no equitable interest, invoked no valid state-law process, and offered no exigent

justification. Under Rule 65, Rule 64, and the Due Process Clause alike, its request for a deposit or freeze of the $324,000 proceeds must be denied.

## III. BMW FS Has Not Shown Irreparable Harm—Its Alleged Injury Is Monetary and Self-Inflicted by Delay

To obtain preliminary relief, BMW FS must prove imminent, non-compensable harm. *See* Sampson v. Murray, 415 U.S. 61, 90 (1974). It cannot. The only injury BMW FS identifies is the potential loss of money—the vehicle's value or its proceeds. That is the definition of a reparable, legal harm.

### A. Monetary Losses Are Not Irreparable

Courts uniformly hold that economic loss, even substantial, is not "irreparable" because it can be remedied by a damages award. *See* Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986) (injunction inappropriate where "adequate compensatory relief will be available in the ordinary course of litigation"). The alleged harm here—the inability to recover the car's $324,000 value—is purely financial. If BMW FS prevails, it can recover that amount (plus interest). Nothing about a 2023 Rolls-Royce Cullinan renders it unique or irreplaceable.

BMW FS speculates that Gauge might not pay a future judgment. But speculation does not establish irreparable harm. There is no evidence that Gauge is insolvent or dissipating assets; it remains an operating business subject to this Court's jurisdiction. *See* Equifax, Inc. v. H & R Block, Inc., 678 F. Supp. 2d 1274, 1282 (N.D. Ga. 2009) (no injunction absent proof that future judgment "may not be collectible"). The asserted injury is therefore entirely compensable.

### B. BMW FS's Delay Defeats Any Claim of Urgency

Even if some harm were conceivable, BMW FS's own inaction refutes any claim of

immediacy. Delay "undercuts any presumption of irreparable injury." Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs., 31 F.3d 1536, 1543 (10th Cir. 1994); *see also* GTE Corp. v. Williams, 731 F.2d 676, 678–79 (10th Cir. 1984).

BMW FS knew by April 2025 that Gauge possessed and intended to sell the vehicle, yet it waited until late September to seek an injunction—five months later, and two months after the Florida action ended. During that time, Gauge lawfully completed the resale. A party that delays while events unfold cannot later claim emergency relief from the consequences of its own inaction. Equity aids the vigilant, not the passive.

### C. An Adequate Remedy at Law Exists

BMW FS has a complete legal remedy: a money judgment. If it establishes that Gauge wrongfully retained the car or its value, the Court can award compensatory damages and prejudgment interest. The Federal Rules provide robust post-judgment enforcement tools— execution, garnishment, and writs—to secure payment. Those remedies eliminate any need for extraordinary equitable relief.

Granting an injunction would invert the normal order—giving BMW FS security before proving entitlement—while imposing unnecessary hardship on Gauge's business. Because BMW FS's alleged harm is (1) purely economic, (2) the product of its own delay, and (3) fully compensable at law, it cannot meet the irreparable-harm requirement. That failure alone requires denial of the motion.

### IV. BMW FS Fails to Demonstrate a Likelihood of Success on the Merits

To obtain preliminary injunctive relief, BMW FS must also show a "substantial likelihood" (or at least a reasonable probability) of success on the merits of its claims. This factor is critical because a court should not impose burdensome injunctions if the moving party's underlying case

is weak or doubtful. Here, without prejudging the ultimate outcome, the record as it stands favors Gauge's legal position, not BMW FS's. At minimum, BMW FS has not made a clear showing of likely success. On the contrary, the evidence indicates that Gauge has **strong defenses** and equitable arguments that may well prevail.

### A. Gauge's Status as a Good-Faith Purchaser for Value with Clean Title Undercuts BMW FS's Claims

The undisputed facts show that Gauge purchased the vehicle in good faith, paid fair value, and received an official state-issued Certificate of Title (from New York) that listed no lienholder. Under the law of virtually every U.S. jurisdiction, including Utah and New York, a certificate of title is the primary indicator of ownership and lien status for motor vehicles. A party who buys a vehicle relying on a clean title, without notice of contrary claims, is generally protected as a bona fide purchaser.

BMW FS's primary theory is that the New York title was "fraudulently" obtained by its customer and thus void or voidable. However, BMW FS faces significant hurdles in advancing that theory against Gauge:

**Article 9 and Certificate of Title Laws:** Assuming BMW FS's interest was a security interest (i.e., BMW FS financed the car but the purchaser was the registered owner), then New York's Certificate of Title Act and UCC rules on interstate collateral come into play. New York Vehicle & Traffic Law requires that liens be noted on the title. If a vehicle from out-of-state is retitled in New York, any existing lien can be preserved for a short period (usually 4 months) but must be re-perfected in New York to remain effective. Here, the New York title issued in August 2024 showed no lien. BMW FS did nothing within the ensuing 4 months to assert a lien in New York. By operation of N.Y. law, after that grace period (December 2024), any BMW FS security interest became unperfected and *ineffective against subsequent purchasers for value*. Gauge's

purchase occurred in March 2025, well after that date. Under UCC Article 9 (as adopted in New York), a buyer of goods takes free of an unperfected security interest if the buyer gives value and takes delivery without knowledge of the interest (UCC § 9-317(b)). Gauge fits that description: it gave value, took possession, and had no knowledge of any claimed interest. Therefore, as a matter of commercial law, Gauge's title is superior to an unperfected lien. BMW FS's likelihood of success on a conversion or replevin theory premised on its lapsed lien is low, because the law prioritizes the bona fide purchaser over a lax party in BMW's shoes. Gauge can point to the public policy behind these laws: they exist to protect innocent purchasers and to incentivize lenders to properly perfect their liens and act timely – something BMW FS failed to do.

**Entrustment and Estoppel:** If BMW FS's theory is that it remained the owner (e.g., if the vehicle was under a lease, with title in the Trust's name), then the "fraudulent title" presumably involved someone impersonating the owner to get a new title. Even in that scenario, BMW FS is not automatically assured victory. The law of entrustment (e.g., UCC § 2-403) can divest even true owners of title if they entrust goods to a person who then transfers them to a good-faith purchaser. Moreover, equity would consider BMW FS's role in enabling the fraud. BMW FS (or its affiliate) gave possession of the vehicle to its customer and apparently also provided that person the incidents of ownership that facilitated retitling (perhaps the previous title or sufficient documents to convince the NY DMV). For at least seven months (August 2024 to March 2025), BMW FS failed to detect or undo the fraudulent retitling. Even after discovering it, BMW FS did not immediately secure the vehicle or alert law enforcement in a way that would prevent innocent buyers from being misled. Gauge came into the picture as an innocent buyer during this lull. The equities in such a situation often favor the innocent purchaser over the original owner who, through negligence or delay, allowed the fraudulent actor to appear legitimate. This is

encapsulated in the legal maxim that *as between two innocent parties, the one who made the loss possible bears the risk*. Here, BMW FS's inaction and trust in its lessee set the stage for the lessee's fraud, whereas Gauge had no knowledge or ability to prevent it. Gauge can compellingly argue that BMW FS is estopped from asserting title against Gauge, or that Gauge acquired title by operation of law when it purchased from the apparent owner. Notably, once New York issued a title in Calderon's name (the seller to Gauge), that title carries presumptive validity. BMW FS will have to overcome the state-issued title. Gauge's position is that BMW FS's own failures caused that title to be clean; thus BMW FS should bear the loss, not Gauge.

**Title Void vs. Voidable:** BMW FS will likely claim the New York title was "void ab initio" due to fraud, meaning Calderon (and thus Gauge) got no title despite the document. However, courts often distinguish between *void* and *voidable* title in cases of fraud. If the fraud was in obtaining title from the true owner, but the true owner entrusted the property, the transferee may have voidable title that can transfer good title to a BFP. Gauge is in a strong position to argue that Calderon had at least voidable title that he could transfer to Gauge, because BMW FS's actions (entrustment) and omissions (not stopping the retitling promptly) clothed him with indicia of ownership. Unless BMW FS can show Gauge was complicit in the fraud (which it has not alleged, and which is not true), the law generally favors finality of transfers to good-faith purchasers.

In light of the above, BMW FS faces an uphill battle to prove that Gauge's title should be unwound or that Gauge is liable for conversion. Gauge has pointed to concrete legal doctrines and evidence that cut off BMW FS's claims. At this preliminary stage, BMW FS certainly has not demonstrated a *clear likelihood* that it will overcome these defenses. The merits involve complex mixed questions of law (secured transactions, title law, possibly choice-of-law between

New York and Florida/Utah) and fact (the nature of the fraud, what BMW FS knew and when, what Gauge knew, etc.). Such complexities typically do not lend themselves to preliminary "likelihood" findings in favor of the plaintiff, especially when the defendant has colorable affirmative defenses that could entirely defeat the claim.

**B. BMW FS's Counterclaims Are Weakened by Its Own Conduct and Laches**

Beyond the pure legalities, BMW FS's equitable claims (like replevin or equitable relief) are tainted by its conduct. Gauge will argue, as it has here, that BMW FS's claims are barred by laches – the equitable doctrine that an unreasonable delay in asserting a known right, causing prejudice to the opposing party, will preclude relief. All elements of laches appear to be present: BMW FS knew of its potential claim to the car by April 2025, yet delayed taking effective action until after Gauge had resold the vehicle (prejudice: Gauge continued to invest in and ultimately sell an asset while BMW FS sat on its rights). This delay could very well bar or limit BMW FS's claims at trial. At a minimum, it makes equitable relief like replevin inappropriate. One who seeks equity must do equity and must not sleep on rights. The fact that BMW FS waited so long could lead the Court, at the merits stage, to deny rescission or replevin as a remedy even if BMW FS proves some technical right – especially if the third-party buyer's rights are considered or if Gauge would be unduly prejudiced.

The unclean hands doctrine might also come into play with regard to BMW FS's pre-litigation tactics. Gauge alleges BMW FS engaged in a campaign of contacting third parties (dealers, auctions) and spreading claims that Gauge's title was no good, without court authorization. Gauge has a tortious interference claim on that basis. If proven, those facts might not defeat BMW FS's ownership claim, but they could influence a court of equity in deciding whether to grant an equitable remedy (e.g., a constructive trust or specific restitution). In short,

BMW FS's hands are not entirely clean in how it proceeded outside of court, and its delays further muddy its case. These factors reduce the likelihood that BMW FS will ultimately prevail in full.

### C. The Court Need Not Resolve the Merits Now, But BMW FS's Lack of a Clear Win Means Injunctive Relief is Unwarranted

In saying BMW FS is unlikely to succeed, Gauge is not asking the Court to adjudicate the entire case at this preliminary junction. Rather, the point is that BMW FS has not met its burden to show a *substantial likelihood* of success. The presence of substantial questions and affirmative defenses is enough to defeat BMW FS's motion. When the merits present a close call or novel issues, preliminary injunctions are generally not issued – especially if they would effectively give one side the spoils (here, $324,000 security) before trial. That is precisely the scenario: BMW FS wants the Court to in effect assume it will win and hold the money now. But Gauge has marshaled strong counter-arguments why BMW FS should not win. This equipoise or tilt in Gauge's favor on the merits means the Court should decline injunctive relief.

In conclusion on this factor, BMW FS has not carried its burden. Gauge's good-faith purchaser status, the lapse of BMW FS's lien, the entrustment and laches issues – all create significant doubt about BMW FS's case. At best, BMW FS has shown there *is a dispute* to be resolved, not that it is likely to win that dispute. Therefore, the "likelihood of success" factor weighs against granting a preliminary injunction.

### V. The Balance of Equities Strongly Favors Gauge; Requiring a $324,000 Deposit Would Impose Severe Hardship on Gauge and Provide an Unearned Windfall to BMW FS

When considering a preliminary injunction, the Court must balance the harm the plaintiff would suffer without an injunction against the harm the defendant (and others) will suffer if the

injunction is granted. Here, that balance tips sharply in Gauge's favor.

On BMW FS's side, as discussed, the harm without an injunction is essentially the delay in possibly recovering money, and the theoretical risk of non-collection. We have shown that risk to be minimal – Gauge is solvent and present. So BMW FS stands to suffer little actual harm if no injunction issues; it will simply proceed to trial and, if it wins, collect in due course. Any *incremental* risk (e.g., that Gauge might spend the money on business expenses) does not outweigh the concrete harm an injunction would inflict.

On Gauge's side, the harm from the requested injunction is concrete and significant. BMW FS asks the Court to order Gauge to effectively segregate or freeze $324,000, the entire proceeds of the sale. For a large multinational like BMW FS (or its trust), $324,000 may be a rounding error, but for Gauge – a small, locally-run automotive business – $324,000 is a substantial sum. If Gauge is forced to post these funds (either with the Court or in a trust account), Gauge will lose the ability to use that money to run its business: buying inventory (other cars), paying employees, marketing, and otherwise generating income. In essence, it would tie up Gauge's liquidity and could even jeopardize Gauge's ongoing operations (depending on Gauge's financial condition). Courts recognize that restraints which hamstring a business's cash flow can cause irreparable injury to that business and are not lightly imposed.

Additionally, if Gauge must surrender the money now, it loses the *time value* of that money (no, a low-interest court account is not the same as being able to invest in one's business). Gauge also bears the opportunity cost – deals it cannot do, cars it cannot buy and flip, because a chunk of its funds are locked away. Meanwhile, BMW FS would be sitting on effectively secured cash without having proven its case. If it turns out BMW FS's claims fail, Gauge will have suffered this harm for nothing (and yes, Gauge could then seek to recover any bond BMW FS posted, but

BMW FS proposed only a minimal bond whereas the harm to Gauge could be far greater in terms of lost business momentum).

In weighing equities, courts also consider whether the requested injunction would essentially give the plaintiff the ultimate relief it seeks, which is generally disfavored at the preliminary stage. That is exactly what would happen here: BMW FS ultimately wants to be paid the $324,000 (or get the car back). Since the car is gone, money is all that's left. An injunction ordering Gauge to set aside the money now is practically equivalent to granting BMW FS the relief it seeks (minus final title determination) before trial. Gauge would be out the money (unable to use it) and BMW FS would be assured of recovery regardless of the case's outcome. This is inequitable because it diminishes Gauge's position and leverage in the litigation, effectively treating Gauge as if it has lost, which is contrary to the presumption of innocence (or non-liability) at this stage. The Tenth Circuit has held that injunctions which disturb the status quo or afford the movant all the relief it could obtain after a full trial are "disfavored" and require an especially strong showing by the movant – a showing not made here. *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975, 977 (10th Cir. 2004) (en banc).

It is also important to note that Gauge did not *willfully* create this dispute. Gauge acted in good faith buying a car under a clean title. Gauge is not some bad actor that needs to be deterred or immediately curtailed. To the extent anyone is at fault for the predicament, it is the rogue lessee who defrauded BMW FS – but that person is beyond the Court's reach (and presumably, BMW FS has other avenues to pursue that individual). So punishing Gauge by freezing its funds would create a perverse outcome: the innocent dealer suffers a huge loss of liquidity, while the global finance company (which had the means to prevent the fraud by better internal controls) suffers little. Equity abhors such a result.

In contrast, if no injunction issues, what is the worst that happens to BMW FS? If Gauge misuses or loses the money, BMW FS can still pursue normal collection – and if that truly becomes a concern, BMW FS could seek a prejudgment attachment via proper channels with actual evidence of asset dissipation. At present, BMW FS's fears are speculative. Gauge has every incentive to maintain assets – it is running a business and needs capital to do so. Indeed, the sale proceeds likely have already been partially reinvested in new inventory (cars) which remain assets that could be attached later if needed.

Finally, the Court can craft relief at final judgment to mitigate any prejudice from not issuing an injunction now. For example, if BMW FS prevails and there's concern about Gauge's ability to pay, the Court can enter judgment promptly, perhaps even require a bond on appeal, etc. These tools ensure BMW FS isn't left without remedy, while avoiding harming Gauge now.

On balance, then, the equities weigh decisively against the requested injunction. Gauge would suffer immediate and potentially ruinous impacts, whereas BMW FS would at most suffer the inconvenience of proceeding through normal litigation and perhaps having to execute a judgment later. The scales of justice tilt in favor of protecting Gauge from unjustified economic handicap during the pendency of this case.

### VI. The Public Interest Does Not Favor Prejudgment Asset Restraints in Routine Commercial Disputes Like This One

The public interest weighs heavily against granting BMW FS's motion.

- **Protecting Due Process and Commercial Stability:** The public has a strong interest in the fair and orderly administration of justice. Allowing prejudgment freezes in ordinary contract or ownership disputes would erode due process and disrupt commerce. Businesses must be able to rely on their right to control property until liability is proven. Denying this injunction

reaffirms that defendants cannot be stripped of assets without proper process—an essential safeguard for all market participants.

- **Preserving the Integrity of the Title System.**  Public confidence in state vehicle-title systems depends on the ability to rely on official records. Gauge purchased a vehicle with a clean New York title. Undermining that reliance absent proof of fraud would destabilize markets and discourage legitimate transactions. The public interest favors protecting the buyer who followed the rules, not the lender that failed to perfect its lien

- **Encouraging Diligence Among Lenders.**  Granting an injunction here would reward BMW FS's inaction and invite complacency among secured creditors. Lenders already have clear remedies—perfect their interests, monitor collateral, and act promptly if fraud arises. The public interest is not served by creating a shortcut that undermines those responsibilities.

- **Maintaining Judicial Integrity and Predictability.** Courts promote the public good by enforcing predictable procedures. BMW FS could have sought a prejudgment writ with evidence and bond under the proper rules; it chose not to. Denying its motion reinforces established channels and discourages parties from seeking premature, improvised relief through emergency injunctions.

- **No Broader Public Policy at Stake.**  This is a private commercial dispute. No public health, safety, or constitutional issue justifies extraordinary equitable intervention. The public interest lies in restraint—ensuring courts resolve property disputes on the merits, not through aggressive interim motions.  In sum, denying the injunction protects due process, market reliability, and judicial integrity. The public interest favors adherence to ordinary legal remedies—not extraordinary asset restraints unsupported by law or equity.

### VII. Laches Bars the Equitable Relief Sought by BMW FS

Laches—"delay that works a prejudice"—is an equitable defense that independently defeats BMW FS's request for injunctive relief. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 121–22 (2002) (defining laches as an "unreasonable delay in bringing suit" that prejudices the defendant). The elements are: (1) knowledge of the claim, (2) unreasonable delay, and (3) resulting prejudice. All are satisfied here.

**1. BMW FS Knew of Its Claim.**

BMW FS admits it "lost" the leased vehicle in early 2024. It failed to alert title authorities or reporting systems and took no effective recovery action. By April 2025, BMW FS also knew the vehicle was being marketed for sale. At that point, it was plainly on notice of its alleged rights.

**2. BMW FS Unreasonably Delayed.**

Despite knowing the risk by April 2025, BMW FS waited more than five months—until late September 2025—to seek injunctive relief. Its intermittent letters or motions in other jurisdictions did not preserve its rights; it neither pursued them to completion nor filed its own lawsuit in time. Even after the Florida Performance Cars dispute ended in July, BMW FS let two more months pass while Gauge openly prepared to sell the car. Delay of that magnitude is incompatible with the "immediate and irreparable harm" BMW now claims. *See Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985)* (delay of several months "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief").


**3. Gauge Was Prejudiced by the Delay.**

Gauge reasonably relied on BMW FS's inaction by continuing to possess, market, and sell the vehicle—incurring storage, transport, and transaction costs. Had BMW FS acted promptly, Gauge could have mitigated or avoided those expenses. The delay also allowed new third-party

interests to arise, increasing Gauge's potential exposure. That is textbook prejudice.

Equity does not reward a party that sleeps on its rights and then seeks emergency relief. BMW FS's delay caused the very circumstances it now invokes as "irreparable harm." Laches therefore bars its request for injunctive relief. See Costello v. United States, 365 U.S. 265, 282 (1961).

Finally, BMW FS's own counterclaims seek equitable remedies that may ultimately be barred or limited by laches at trial. A court should not grant an interim equitable remedy that laches would preclude on the merits. The doctrine exists to prevent precisely this sort of inequitable, belated demand for extraordinary relief.

## Conclusion

BMW FS's motion for TRO and preliminary injunction should be denied. Gauge remains ready to litigate this case on the merits to determine the rightful allocation of loss between it and BMW FS. That process will yield a fair result with finality. In the meantime, there is no emergency and no legal warrant to effectively give BMW FS the fruits of victory prematurely. Should BMW FS ultimately prevail, the Court can ensure it is made whole. But until then, Gauge should not be stripped of its assets or forced into a position of undue weakness.

For these reasons, Gauge respectfully requests that the Court **DENY** Defendants' Motion for Temporary Restraining Order and Preliminary Injunction.

Dated: October 24, 2025                    Respectfully Submitted,

                                           By: */s/ Chad Pehrson*

                                           Chad Pehrson Esq.
                                           Counsel for Plaintiffs