Chad Pehrson (12622) cpehrson@knh.law
Nathan Gardner (19537) ngardner@knh.law
**KNH LLP**
50 West Broadway, Ste. 900
Salt Lake City, UT 84101
(801) 994-4646
*Attorneys for Plaintiff Gauge Automotive, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GAUGE AUTOMOTIVE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BMW FINANCIAL SERVICES NA, LLC and FINANCIAL SERVICES VEHICLE TRUST,<br><br>Defendants. | **PLAINTIFF'S MOTION FOR A SPEEDY HEARING AND DECLARATORY JUDGMENT UNDER FED. R. CIV. P. 57, AND FOR SUMMARY JUDGMENT ON ITS FIRST CAUSE OF ACTION UNDER FED. R. CIV. P. 56**<br><br>Case No. 2:25-cv-00792-AMA-JCB<br><br>District Judge Ann Marie McIff Allen<br>Magistrate Judge Jared C. Bennett |

## INTRODUCTION AND RELIEF REQUESTED

Plaintiff Gauge Automotive, Inc. ("Gauge") moves under Federal Rule of Civil Procedure 57, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure 56 for the following relief:[1]

[1] The Vehicle is a 2023 Rolls-Royce Black Badge Cullinan bearing VIN SLATV8C0XPU216487. Defendants BMW Financial Services NA, LLC ("BMW FS") and Financial Services Vehicle Trust ("FSVT") are referred to together as "BMW" except where the distinction matters. Citations to "SUMF ¶ __" are to the Statement of Undisputed Material Facts below; citations to "Ex. __" are to the Appendix of Evidence submitted with this motion; "BMWFS-____" refers to Bates numbers in Defendants' document production.

1. An order under Rule 57 setting Gauge's claim for declaratory relief (First Cause of Action, Complaint ¶¶ 12–16, ECF No. 2-1) for a speedy hearing at the Court's earliest convenience after briefing on this motion closes, and, in aid of that hearing, directing that Defendants file any response to this motion within fourteen days after entry of the Court's order and that Gauge may file any reply within seven days after service of the response; and[2]
2. Upon that hearing, a declaratory judgment that: (a) Gauge acquired good title to the Vehicle when it purchased the Vehicle for value on March 4, 2025, in good faith and without notice of any claim by Defendants; (b) whatever interest Defendants held in the Vehicle under the December 28, 2022 lease to Blackfire Transport LLC—whether characterized as a lien, a security interest, or ownership—is not enforceable against Gauge or against anyone who takes title through Gauge; (c) Gauge's sale of the Vehicle to JR Auto Collection, LLC d/b/a Florida Performance Cars ("FPC"), its repurchase from FPC, and its later sale to Secured Auto Group, LLC were rightful transfers of good title; and (d) Defendants may not enforce against Gauge any remedy for the Blackfire default or the fraudulent retitling of the Vehicle.

**Grounds.** The material facts come almost entirely from BMW's own documents and its sworn discovery responses, and they are not in dispute. They show that BMW voluntarily placed the Vehicle in the hands of a lessee it had flagged as a credit risk; that BMW located the Vehicle in New York in September 2024, identified the man holding it in October 2024, learned by December 18, 2024 that New York had issued a clean title with no lien on it, confirmed by February 12, 2025

[2] The Complaint invokes Utah's Declaratory Judgments Act, Utah Code § 78B-6-401 et seq. ECF No. 2-1 ¶ 16. In this Court, the procedure for declaratory relief is supplied by 28 U.S.C. § 2201 and Rule 57; the substantive question—who owned the Vehicle on March 4, 2025—is the same under either.

that the title stood in that man's name, and was told by the State Police in January 2025 and by the NYPD in February 2025 what it needed to send to have the Vehicle reported stolen; and that BMW instead "suspended repossession," made no filing to note or protect its interest with any department of motor vehicles, and left the Vehicle in the stream of commerce wearing a clean state title until Gauge bought it.

Under the Uniform Commercial Code and the certificate-of-title statutes, a good-faith purchaser in Gauge's position takes free of BMW's claimed interest, and equity places the loss on the party whose choices and inaction made the loss possible. Because the First Cause of Action turns on legal questions applied to an undisputed record, and because BMW continues to cloud the Vehicle's title in three states while it litigates elsewhere, Rule 57 calls for a speedy hearing and a prompt declaration.

## BACKGROUND

This section tells the story. The Statement of Undisputed Material Facts that follows supplies the record citations.

### A. BMW's bet on Blackfire.

On December 28, 2022, a Miami Rolls-Royce dealer leased a brand-new Black Badge Cullinan, agreed value $489,694, to Blackfire Transport LLC, a North Miami Beach transport company whose president and sole owner, Alfred Davis, personally guaranteed the lease. The dealer assigned the lease to BMW FS, which administers it as servicer for FSVT. BMW's credit decision records what it knew going in: it "capped" the deal at a $4,000 monthly payment "due to limited verifiable wealth and late payments with prior FS auto." BMW took a $193,033.69

capitalized cost reduction, recorded FSVT as owner and lienholder on a Florida electronic title, and handed Blackfire the keys.

**B. BMW loses the Vehicle, finds it, and does nothing.**

Blackfire paid on time for fourteen months. In February 2024 its payments began to bounce; the last that cleared was $4,200 on June 1, 2024. BMW’s collectors could not reach anyone. On August 8, 2024, a collector noted that the “debtor [is] involved in [a] fraud scheme,” linking a Department of Justice press release, and four days later BMW approved repossession. Recovery agents ran Blackfire’s Florida addresses and found nothing. On August 20, a caller from a (646) number who identified himself as “Manuel” made a payment of roughly $7,300 and said the car was with “the president of the company”; BMW put repossession on hold, and the payment bounced three days later as “Customer Advises Not Authorized.” That same month, on August 27, 2024, the New York DMV issued a certificate of title for the Vehicle to Steven J. Calderon of Scarsdale stating “NO LIENS RECORDED,” and two days later Florida cancelled FSVT’s title, recording the reason as “OUT-OF-STATE TITLE.”

BMW did not notice; its account notes for September and December 2024 still recite “Title Status: Electronic Lien Verified.” But BMW did find the car. A GPS “ping” placed it on Cook Avenue in Yonkers, New York on September 18, 2024; on September 25 BMW’s field agent reported that the “unit is confirmed in the garage at 51 Cook Ave, Yonkers, NY”; and on October 2 the agent identified the people holding it: “3rd parties are Steven J Calderon and Camila Calderon.” BMW thus had the car’s location, the name of the man who would later sell it, and a lease authorizing it to “[t]ake possession of the Vehicle by any method permitted by law.” It did not take possession. It tagged the account “Charge off Potential,” placed repossession on hold under a

Florida hurricane-relief program while the car sat in New York, re-approved repossession on December 6, and sent an agent back to Cook Avenue, who did not see the car.

**C. BMW learns of the title wash and still does nothing a buyer could see.**

On December 18, 2024, a New York State Police investigator emailed BMW that the Cullinan had been "purchased in FL, which is now titled in NY, to a known fraudster, with no lien on the title." BMW's collections manager replied within minutes that BMW would "be happy to work together to file this as stolen," and that afternoon BMW pulled an AutoCheck report confirming the August 27, 2024 New York title.

Then BMW waited. On January 6, 2025, the manager wrote internally that the title had been "washed from FL to NY" and that "[t]his is a RRMC so one we will want to get back if we can." That afternoon the investigator told her what the police needed: "a formal request that the vehicle be reported stolen," written "on a letterhead." She answered, "We do not have any issues with reporting this vehicle stolen if that is needed for your investigation." No letter followed.

BMW's only outreach to the New York DMV came on January 7, in two form letters. One, describing FSVT as "the lienholder," asked for title and registration "receipts" to support "a claim." The other, describing FSVT as "the Owner," authorized a BMW FS title clerk to seek a corrected or duplicate title—and BMW has identified no application that followed. Neither letter asked the DMV to note a lien or to suspend the certificate. That same day BMW removed the account from repossession status for good. On January 16, the manager forwarded the investigator's emails to BMW's legal department. By February 12, BMW had an electronic copy of the New York title confirming that "Steven J. Calderon . . . is the owner as of 8/27/24." On February 19, an NYPD detective told BMW that if it sent a letter confirming the fraud and its

interest, "he will then create a report to mark this as stolen. Once it is marked as stolen they can work to pickup the vehicle." BMW's response, recorded that day, was to note that the matter was "with outside counsel in NY" and to close its case with its title-recovery vendor. Its letter to the NYPD is dated February 25, 2025—seven weeks after the State Police told BMW how to get the Vehicle flagged.

In sworn interrogatory answers, BMW explains: "Because there existed an active title without FSVT's ownership interest, BMW FS could not repossess the Vehicle," so BMW "suspended repossession services and began efforts to retake title." Nothing BMW did between August 27, 2024 and March 4, 2025 was visible to a buyer. It made no filing with the New York DMV to note or protect its interest, and it has identified no request to suspend the title and no theft report, lien notation, or database entry—NMVTIS, NCIC, Carfax, AutoCheck, or otherwise—that existed on March 4, 2025. Asked to identify any record "available to Gauge on March 4, 2025" that would have disclosed its claim, BMW offered only that "the Florida DMV reflected FSVT's ELT," a title Florida had cancelled six months earlier. BMW did not even ask New York for "copies of documents that were used to get NY title issued" until September 2, 2025. And when it came to plead its own version of events in this Court, BMW alleged that it "discovered" the fraudulent retitling "on or about April 2025"—four months after the State Police told it.

**D. Gauge buys the Vehicle, and BMW's claim surfaces months later.**

Gauge is a small Utah wholesale dealer whose typical transaction is a $30,000 vehicle sold at a margin of about $1,000. In late February 2025, a licensed Utah dealer introduced Gauge to a New York seller who identified himself as Steven Calderon, the owner named on the Vehicle's New York title, and who held the Vehicle and the title. Gauge did what a careful dealer does: it

examined the title, which named Calderon as owner and showed no liens; pulled the New York DMV's own title record, which matched; and inspected the car. On March 4, 2025, Gauge closed its purchase from Calderon at $310,000 (the wire was sent the following day), took delivery in New York, and—because it already had a buyer—sold the Vehicle the same day to FPC, a Florida dealer, for $314,000. Gauge had never heard of BMW's claim. BMW admits that "before March 4, 2025, [Defendants] were unaware of Gauge's involvement with the Vehicle and did not communicate with Gauge," that it is "unaware of evidence of Gauge's participation in the forged Florida title, the resulting fraudulent New York Title Application, or other fraud occurring prior to March 4, 2025," and, in its Counterclaim, that "it is presently unclear the extent to which Gauge . . . was aware" of the fraud at all.

BMW's claim reached FPC in April 2025—six weeks after Gauge's sale—by telephone and then by an April 23 letter from BMW's counsel captioned "NOTICE OF LIEN ON VEHICLE AND DEMAND FOR PRESERVATION," which described BMW's interest in terms BMW now disowns: the Vehicle "was purchased with financing provided by BMW FS and is subject to a lien in favor of FSVT," and "FSVT is the valid lienholder." FPC sued Gauge in Florida. Gauge stood behind its sale: it refunded FPC the full $314,000, took the Vehicle back, and indemnified FPC, and FPC dismissed its suit. Not until July 2025—more than four months after Gauge's purchase—did BMW direct anything to Gauge: a motion to intervene in FPC's suit against Gauge, and then a demand letter dated July 25 describing BMW FS as the "owner" of a Vehicle "stolen . . . by its original lessee." On August 22, 2025, Utah issued its own certificate of title for the Vehicle to Gauge, showing no lienholder. Gauge then placed the Vehicle with Secured Auto Group, a Utah

dealer, and sold it to Secured Auto Group in October 2025 with full disclosure of BMW's claim; Secured Auto Group resold it to an Arizona dealer.

**E. Two lawsuits, one question.**

Gauge filed this action in the Third Judicial District Court for Salt Lake County on August 6, 2025, to settle the question of title. ECF No. 2-1. BMW removed it, moved to dismiss or transfer the case to Florida, and then withdrew that motion. ECF Nos. 2, 11, 24. BMW had also sued in Palm Beach County, Florida against Gauge, FPC, Blackfire, Mr. Davis, and the Florida DMV. On October 8, 2025, it counterclaimed here for the mirror image of the declaration Gauge seeks—that the New York title is "void" and that FSVT is the Vehicle's "rightful owner and lienholder"—plus replevin, conversion, unjust enrichment, trespass to chattels, and tortious interference, ECF No. 16, and moved for a temporary restraining order freezing Gauge's sale proceeds, ECF No. 19. Gauge answered, pleading its good-faith purchase and the defenses of estoppel, waiver, laches, and unclean hands. ECF No. 38. The Court denied expedited relief, observing that BMW's "attempt to pursue the same claims simultaneously in two jurisdictions raises a number of concerns" and that "BMW must decide where it intends to pursue its claims against Gauge." ECF No. 37 at 2. BMW's response was to dismiss its counterclaims here without prejudice, ECF No. 48, while continuing to litigate in Florida, where its action remains pending and no court has reached the merits of the title question.[3]

Meanwhile, BMW's counsel has written to Gauge's downstream buyer asserting that Gauge "was aware of the fraudulent title under which Gauge made its purchase"—an assertion

[3] Defendants have not filed an answer to the Complaint. Gauge does not rest this motion on that omission; the material facts are established by Defendants' own documents and sworn discovery responses, and Defendants have litigated this case since September 2025 through their motion to dismiss, their Counterclaim (ECF No. 16), and their motion for a temporary restraining order.

BMW cannot support with a single document or witness—and has demanded the identity of the next purchaser, warning that a refusal "may reasonably be viewed by my clients as making you and your company complicit in Gauge's improper actions."

The cloud BMW has placed on this Vehicle's title, and on Gauge's name, will not lift until a court declares who owned the Vehicle on March 4, 2025. That question is ripe, it is legal, and it is ready to be answered.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

***The Lease and BMW's Interest***

1. On December 28, 2022, Braman Motors, Inc. of Miami, Florida leased the Vehicle, new, to Blackfire Transport LLC ("Blackfire") under a Motor Vehicle Lease Agreement (Closed End) (the "Lease") with a 48-month term, monthly payments of $4,000, an agreed vehicle value of $489,694.00, a capitalized cost reduction of $193,033.69, and a scheduled maturity date of December 27, 2026. Alfred L. Davis, Blackfire's president and sole owner, signed as guarantor. Ex. 1 (Lease) at BMWFS-0004, 0009–10; Ex. 18 (Fla. Compl.) ¶¶ 9, 14–17.

2. The Lease was assigned to Rolls-Royce Motor Cars Financial Services, a division of BMW FS, and then to FSVT. BMW FS's role with respect to the Lease and the Vehicle "is, and at all relevant times has been, that of servicer for FSVT." Ex. 15 (Defs.' Resps. to Reqs. for Admis. ("RFA Resp.")) Nos. 1, 4; Ex. 1 at BMWFS-0004, 0010 (assignment provisions); Ex. 18 ¶¶ 5, 15; ECF No. 11 at 2.

3. The Lease prohibits the lessee from transferring or subleasing the Vehicle without the lessor's prior written approval and, upon default, permits the lessor to "[t]ake possession of the

Vehicle by any method permitted by law." Ex. 1 at BMWFS-0008 (¶ 35) (transfer), BMWFS-0006 (¶ 23) (remedies).

4. BMW's credit approval for the Lease, dated December 30, 2022, states: "Max $4,000 monthly payment. . . . Capped due to limited verifiable wealth and late payments with prior FS auto." Ex. 2 (Approval Notification, BMWFS-0013).

5. FSVT applied for a Florida certificate of title naming FSVT as owner and as lienholder, with Blackfire as lessee. On January 20, 2023, Florida issued electronic title No. 0149208992 identifying FSVT as both owner and lienholder. Ex. 3 (Fla. title application, BMWFS-0022–23; also at BMWFS-0248–49); Ex. 4 (Fla. ELT record, BMWFS-0218); RFA Resp. Nos. 1–2.

6. BMW FS "has never been the record titleholder of the Vehicle in any State," and Defendants are "unaware of being named as owner or lienholder on a certificate of title for the Vehicle issued by the State of New York." RFA Resp. Nos. 3, 5.

***Default and BMW's Recovery Efforts***

7. Blackfire's February 27, 2024 payment was returned for insufficient funds, as was its March 27, 2024 payment. The last payment that cleared was $4,200 on June 1, 2024. No payment due on or after May 27, 2024 was ever satisfied. Ex. 7 (Transaction Statement, BMWFS-0002–03; Payment Delinquency Statement, BMWFS-0085–86); Ex. 6 (BMW FS account notes, BMWFS-0088–0109), entries dated 3/7/2024, 4/5/2024, 6/1/2024.

8. On August 8, 2024, a BMW FS collector noted in the account: "debtor involved in fraud scheme," with a link to a United States Department of Justice press release. Ex. 6, entry dated 8/8/2024 (BMWFS-0105).

9. On August 12, 2024, BMW FS approved repossession: "REPOSSESSION APPROVED: [77] Days delinquent . . . Title Status Electronic Lien Verified" (brackets in original). The request stated: "Debtor seems to be involved in a fraud scheme." Ex. 6, entries dated 8/12/2024 (BMWFS-0105). Recovery agents ran Blackfire's Florida addresses between August 12 and September 12, 2024 and did not locate the Vehicle. Ex. 6, entries dated 8/12/2024 through 9/12/2024 (BMWFS-0099–0105).

10. On August 20, 2024, a third party calling from (646) 704-6611 and identifying himself as "Manuel" made a payment of approximately $7,300 on the account and told BMW FS "that the car was wiith [sic] the president of the company." BMW FS removed the account from "OUT FOR REPO" status and placed a repossession hold. The payment was returned on August 23, 2024 with the reason "Customer Advises Not Authorized." Ex. 6, entries dated 8/20/2024, 8/21/2024, 8/23/2024 (BMWFS-0102–03); Ex. 7 (BMWFS-0003, 0043).

11. On August 12, 2024, a registration event for the Vehicle occurred in New York. On August 27, 2024, the New York DMV issued Certificate of Title Document No. 710332V for the Vehicle to "Calderon, Steven, J," 441 Central Park 280, Scarsdale, New York 10583, stating "NO LIENS RECORDED." Ex. 10 (N.Y. title, BMWFS-0221); Ex. 9 (BMW FS letter to NYPD dated Feb. 25, 2025, BMWFS-0247) ("8/12/2024 Registration event occurred in New York"; "8/27/2024 New title created in New York"); Ex. 6, entry dated 2/12/2025 (BMWFS-0088) ("Steven J. Calderon . . . is the owner as of 8/27/24").

12. On August 29, 2024, the Florida Department of Highway Safety and Motor Vehicles cancelled Florida title No. 0149208992. Florida's record states "TITLE STATUS CANCELLED," "TITLE CANCEL DATE 08/29/2024," "CANC.REASON OUT-OF-STATE

TITLE," and "CURR STATE NY - NEW YORK." Ex. 5 (FLHSMV title record, BMWFS-0308). BMW has alleged that Florida "cancelled [FSVT's] otherwise valid Certificate of Title when the NY DMV issued the NY Title." Ex. 18 ¶ 69.

13. BMW FS's account notes dated September 4, 2024 and December 6, 2024 continued to recite "Title Status: Electronic Lien Verified." Ex. 6, entries dated 9/4/2024 (BMWFS-0101) and 12/6/2024 (BMWFS-0091).

14. BMW FS was able to obtain the Vehicle's location by "ping." On September 18, 2024, a "manual ping" placed the Vehicle at 54 Cook Avenue, Yonkers, New York. On September 20, 2024, BMW's field agent reported: "this vehicle is being kept in an indoor garage blocked in by another vehicle at a 3rd parties home." On September 25, 2024, the agent reported: "unit is confirmed in the garage at 51 Cook Ave, Yonkers, NY." Ex. 6, entries dated 9/18/2024, 9/20/2024, 9/25/2024 (BMWFS-0096–97).

15. On October 2, 2024, BMW's agent reported: "3rd parties are Steven J Calderon and Camila Calderon at 50 Cook Ave Yonkers NY." The same day BMW FS added "Charge off Potential" to the account. Ex. 6, entries dated 10/2/2024 (BMWFS-0095). The agent repeated the Calderon identification on December 9, 2024, January 6, 2025, and January 7, 2025. Ex. 6 (BMWFS-0089–90).

16. Between October 1, 2024 and January 22, 2025, BMW FS recorded repeated pings placing the Vehicle at or near 51 Cook Avenue, Yonkers. Ex. 6, entries dated 10/2/2024, 10/8/2024, 12/6/2024, 12/12/2024, 1/22/2025 (BMWFS-0089–95).

17. On October 18, 2024, BMW FS removed the Vehicle from "OUT FOR REPO" status; the account was "held due to Hurricane Milton protection which ended 12/4." On December

6, 2024, BMW FS again approved repossession ("[193] Days delinquent") (brackets in original). On January 7, 2025, "OUT FOR REPO" was removed from the account and was not reinstated. Ex. 6, entries dated 10/18/2024 and 12/6/2024 (BMWFS-0091), 1/7/2025 (BMWFS-0089); Ex. 16 (Defs.' Answers to Interrogs. ("Interrog. Ans.")) No. 9.

18. Neither BMW FS nor FSVT possessed the Vehicle at any time between August 27, 2024 and March 4, 2025. RFA Resp. No. 13.

***BMW's Knowledge of the New York Title***

19. On December 18, 2024, Investigator Thomas Karasinski of the New York State Police Special Investigations Unit emailed BMW FS's Team Manager, Collection Services, Amy Nolan: "We were just notified of another likely fraud purchase: a 2023 Rolls Royce Cullinan black badge (VIN: SLATV8C0XPU216487), purchased in FL, which is now titled in NY, to a known fraudster, with no lien on the title." Ms. Nolan replied seven minutes later: "We have interest in this account. I will have my team research to see if we can confirm fraud. If we are able to, we would be happy to work together to file this as stolen and work to move forward on obtaining the vehicle." Ex. 8 (BMWFS-0198; also at BMWFS-0244).

20. The same day, BMW FS reviewed an AutoCheck report reflecting a "NY title in August of 2024," a registration event in Scarsdale on August 12, 2024, and a title issued August 27, 2024. Ex. 6, entries dated 12/18/2024 (BMWFS-0090). BMW admits that it "first learned of the potential title fraud regarding the Vehicle from a New York State Police Special Investigations Unit investigator on December 18, 2024," and that it "confirmed the title status loss on or about January 6, 2025." Interrog. Ans. Nos. 7, 8.

21. On January 6, 2025, Ms. Nolan wrote to BMW FS colleagues: "They advised this account has a title wash, so I pulled the Experian report, and this appears accurate. Looks like it was washed from FL to NY . . . . Are you able to work with the DMVs to confirm records so we can see next steps in getting our name back on this title. This is a RRMC so one we will want to get back if we can. My plan is to let the law enforcement agent know we were unable to confirm this as an Auto Bust Out but if they would like us to file a stolen vehicle report due to the title being washed, then we would be willing too." Ex. 8 (BMWFS-0200). The same day, Investigator Karasinski advised the NYPD, copying Ms. Nolan, that BMW FS "has a financial interest in this Rolls Royce Cullinan." Ex. 8 (BMWFS-0199).

22. Also on January 6, 2025, Investigator Karasinski wrote to Ms. Nolan that "FLHSMV and NYS DMV confirmed the same," and that the State Police "usually ask for a formal request that the vehicle be reported stolen, as the vehicle is rightfully owned by BMWFS, and the fraud of washing the lien shows obvious intent as to deprive BMWFS of the vehicle and outstanding balance." Ms. Nolan replied: "We do not have any issues with reporting this vehicle stolen if that is needed for your investigation. However, in the past, we have had issues reporting the vehicles stolen and tend to get the run around. Is this something you and/or your team could assist with?" Investigator Karasinski answered that the State Police work with finance companies on the understanding, among others, "that the finance company will write it on a letterhead, requesting that the vehicle be reported stolen based on their findings," and closed: "Please let us know if we can ever be of any help." Ex. 8 (BMWFS-0196; also at BMWFS-0242). On January 16, 2025, Ms. Nolan forwarded the investigator's emails to BMW FS's legal department, noting that

BMW had "just requested the DMV records on 1/7/2025." Ex. 8 (BMWFS-0195); Ex. 6 (BMWFS-0088) ("Working with Legal Steve Forry and Mark Smith on this one.").

23. On February 12, 2025, BMW FS's title-recovery vendor reported to BMW FS that it had "obtained an electronic copy of the title from NY," attached the copy "for your records," and confirmed that "Steven J. Calderon, 441 Central Park, Scarsdale NY is the owner as of 8/27/24." Ex. 6, entry dated 2/12/2025 (BMWFS-0088).

24. On February 19, 2025, BMW FS recorded a call with NYPD Detective Shamere Boland: "He advised that if we can send a letter saying we have confirmed fraud, have interest in this vehicle, days past due, when last payment was made, ect [sic], he will then create a report to mark this as stolen. Once it is marked as stolen they can work to pickup the vehicle. Based on license plate scans, vehicle in good condition." The same day BMW FS noted: "Working with Legal . . . . They have this with outside counsel currently," and "Closed open Goldfien case since this is with outside counsel in NY." Ex. 6, entries dated 2/19/2025 (BMWFS-0088).

25. BMW FS's letter to the NYPD requesting that the Vehicle be identified as stolen "within their record system" is dated February 25, 2025. Ex. 9 (BMWFS-0247); Interrog. Ans. No. 6.

26. Asked to identify every report, notice, filing, or database entry made before March 4, 2025 to any law-enforcement agency, department of motor vehicles, NMVTIS, the National Insurance Crime Bureau, Carfax, AutoCheck, or any other third party flagging any theft, lien, or ownership claim concerning the Vehicle, BMW identified only BMWFS-0105 through BMWFS-0204—a range consisting of its own account notes and statements, the Lease and Florida title paperwork, and the law-enforcement correspondence described above, and containing no report,

flag, or database entry made to any third party after the New York title issued. Interrog. Ans. No. 10; Ex. 17 (Defs.' Resps. to Reqs. for Produc. ("RFP Resp.")) No. 10.

27. BMW FS's two form letters to the New York DMV, both dated January 7, 2025, were a "Request for title and registration receipts," which described FSVT as "the lienholder for the vehicle listed below" and requested "any receipts of titling and registration . . . to enable us to validate the timeliness of the titling and registration of this vehicle for a claim," and a "Letter of authorization" appointing a BMW FS employee as attorney-in-fact "to correct or duplicate the title and/or registration." Ex. 23 (BMWFS-0067, 0077).

28. BMW states that it "began the process to request records from the New York Department of Motor Vehicles" on or about January 7, 2025 and received records in or about March 2025. Interrog. Ans. No. 6. Its account notes record receipt of "NY DMV records" on February 5, 2025. Ex. 6 (BMWFS-0088).

29. BMW has identified no application to the New York Commissioner of Motor Vehicles to suspend, revoke, or annul the New York title, and no delivery to the New York DMV of any certificate, notice of lien, or application to note an interest on the title. Interrog. Ans. Nos. 4, 6; RFP Resp. Nos. 2–3 (identifying only BMWFS-0195–0204, 0218, 0247–49, and 0307–09). BMW denied requests to admit that it never made such a filing, RFA Resp. Nos. 11, 14, but has produced and identified none. Id.

30. BMW is "unaware of any court or governmental agency that had entered an order or adjudication declaring the New York Title invalid or void as of March 4, 2025." RFA Resp. No. 18.

31. BMW explains its inaction as follows: "Because there existed an active title without FSVT's ownership interest, BMW FS could not repossess the Vehicle." Interrog. Ans. No. 8.

"Upon discovery of the existence of an active title without FSVT's ownership interest, Defendants suspended repossession services and began efforts to retake title." Interrog. Ans. No. 9.

***Gauge's Purchase***

32. Gauge is a licensed Utah motor vehicle dealer (Dealer License No. 305B) with its principal place of business in West Valley City, Utah, whose business consists primarily of wholesale purchases and sales of vehicles. A typical Gauge transaction involves a vehicle in the range of $30,000, on which Gauge earns a margin of approximately $1,000 or less. Ex. 11 (Decl. of Josh Hirahara ("Hirahara Decl.")) ¶¶ 2–3.

33. In late February 2025, a licensed Utah dealer introduced Gauge to a seller who identified himself as Steven J. Calderon—the owner named on the Vehicle's New York certificate of title—and who represented that he owned the Vehicle and held the title. Before purchasing, Gauge (a) reviewed the New York certificate of title, which named Calderon as owner and recorded no liens; (b) on February 21, 2025, obtained a New York Vehicle Title Record Report drawn from the New York DMV's records, which matched the certificate—Calderon as registered owner, title issued August 27, 2024, no lienholder; and (c) inspected the Vehicle by video with the seller, using a paint-depth meter Gauge shipped to him. Hirahara Decl. ¶¶ 4–9 & Exs. A–B; *see also id.* Ex. D; ECF No. 16 ¶ 9.

34. On March 4, 2025, Gauge purchased the Vehicle from Calderon for $310,000, paid by wire sent on March 5, 2025, and took delivery of the Vehicle and the New York certificate of title in New York. Calderon executed a secure power of attorney authorizing Gauge to transfer the title. Hirahara Decl. ¶¶ 10–11 & Exs. D–E; *see also* ECF No. 16 (Countercl.) ¶ 9 (alleging that Gauge "purchased the Vehicle from Mr. Calderon for $310,000 and sold it to FPC for $314,000").

35. When it paid for and took delivery of the Vehicle, Gauge had no knowledge or notice of the Lease, of Blackfire or Mr. Davis, of BMW FS or FSVT, of any lien or ownership claim asserted by any of them, or of any defect in the New York title. Hirahara Decl. ¶ 13.

36. BMW admits, "[t]o the best of Defendants' knowledge," that "before March 4, 2025, [Defendants] were unaware of Gauge's involvement with the Vehicle and did not communicate with Gauge concerning the Vehicle or any Claimed Interest before that date." RFA Resp. No. 21.

37. BMW admits that it is "presently . . . unaware of evidence of Gauge's participation in the forged Florida title, the resulting fraudulent New York Title Application, or other fraud occurring prior to March 4, 2025." RFA Resp. No. 25.

38. BMW denied broader requests concerning Gauge's knowledge, RFA Resp. Nos. 23–24, 28–29, but has identified no evidence supporting those denials. Asked to state all facts and identify all evidence supporting any contention that Gauge had knowledge of BMW's claim or of any title defect before its purchase, BMW objected and identified none. Interrog. Ans. No. 11; RFP Resp. No. 12 (citing only FPC's June 23, 2025 complaint, BMWFS-0207–18).

39. In its Counterclaim, BMW alleged that "it is presently unclear the extent to which Gauge . . . was aware of the secret title-fraud activities," asserting only that Gauge "knew of the title-fraud before July 2025, because FPC notified Gauge of the fraud via the FPC Lawsuit"—a suit filed June 23, 2025. ECF No. 16 ¶ 11; Ex. 18 ¶ 30.

40. Asked to identify every record "available to Gauge on March 4, 2025" that "would have disclosed any Claimed Interest or any defect in the New York Title," BMW answered: "Defendants do not know what was 'available to Gauge' at any time, let alone on March 4, 2025,

but the Florida DMV reflected FSVT's ELT." Interrog. Ans. No. 12. Florida had cancelled that title on August 29, 2024. Ex. 5 (BMWFS-0308).

41. On March 4, 2025, Gauge sold the Vehicle to FPC for $314,000 and delivered the Vehicle to FPC in New York. Ex. 12 (Invoice No. 9672 and Wholesale Agreement, BMWFS-0216–17); Hirahara Decl. ¶ 12. BMW FS's own wholesale valuation of the Vehicle in January 2025 was $303,000. Ex. 6, entry dated 1/23/2025 (BMWFS-0089) ("MMR: $303,000.00"). The same entry records a lease "Payoff" of $304,940.31. Id.

***BMW's Post-Purchase Assertions***

42. BMW first asserted its claim to FPC by telephone on April 16, 2025 and by a letter from its counsel dated April 23, 2025, captioned "NOTICE OF LIEN ON VEHICLE AND DEMAND FOR PRESERVATION." The letter stated that "the Vehicle was purchased with financing provided by BMW FS and is subject to a lien in favor of FSVT," that "FSVT's lien was washed from the Vehicle's Certificate of Title," and that "FSVT is the valid lienholder and is legally entitled to possession of the Vehicle." Ex. 13 (BMWFS-0276–77); RFA Resp. No. 30; Ex. 18 ¶¶ 26–27; Hirahara Decl. ¶ 14.

43. BMW's first written demand to Gauge was a letter from its counsel dated July 25, 2025 and received July 28, 2025, which stated that "BMW FS is the owner of the Vehicle, which was stolen via procurement of fraudulent title documentation by its original lessee," and demanded the Vehicle's "immediate return." Ex. 14 (BMWFS-0205–06); RFA Resp. Nos. 26, 30; Interrog. Ans. No. 4; Hirahara Decl. ¶ 16.

44. In this action, BMW states that "Defendants claim an ownership interest in the Vehicle." Interrog. Ans. No. 3. In its Counterclaim, BMW pleaded that FSVT was the Vehicle's

"owner/lessor and lienholder," that "Counterclaimants' interest in the Vehicle was first perfected," and that FSVT is the Vehicle's "rightful owner and lienholder." ECF No. 16 ¶¶ 7, 32 & at 11. On October 3, 2025, BMW's counsel wrote that "BMW is the owner of the vehicle regardless of any claims of subsequent titles," while proposing that Gauge sell the Vehicle on agreed terms with "[t]he funds of the sale" to be "deposited with either the Utah or Florida court," and stated by email that "BMW is the owner of the vehicle since the time it was sold by the dealer to BMW" and that "any purchaser of the vehicle will be subject to, at the very least, litigation." ECF No. 16-1 at 2; ECF No. 16-2 at 2. In its Florida complaint, BMW pleads that FSVT is the Vehicle's "owner and lienholder" and that "Blackfire and Davis directly or indirectly caused the Vehicle's transfer to Manuel Calderon and/or Steven J. Calderon, without RRMC FS's approval." Ex. 18 ¶¶ 42, 58.

45. BMW FS has made no charge-off, insurance claim, fraud-loss claim, residual-value claim, indemnity claim, or subrogation claim relating to the Vehicle or the Lease, and has received no recovery. Interrog. Ans. No. 17. It continued to bill Blackfire $4,000 per month through at least February 2025. Ex. 7 (BMWFS-0003).

46. After FPC received BMW's demand and sued Gauge on June 23, 2025, Gauge refunded FPC's $314,000 purchase price, took the Vehicle back, and agreed to indemnify FPC; FPC dismissed its suit on July 21, 2025. Hirahara Decl. ¶ 15 & Ex. F; Ex. 18 ¶¶ 30, 35–36.

47. On August 22, 2025, the Utah State Tax Commission, Division of Motor Vehicles, issued Utah Certificate of Title No. UT011833095 for the Vehicle to Gauge Automotive, listing no lienholder. Ex. 19 (BMWFS-0252); Hirahara Decl. ¶ 17 & Ex. G.

48. On July 23, 2025, Gauge delivered the Vehicle to Secured Auto Group, LLC, a Utah dealer, so that Secured Auto Group could assist Gauge in selling it. Gauge sold the Vehicle to

Secured Auto Group for $324,000, after disclosing BMW's claim and this litigation; Gauge issued Invoice No. 11235 for the sale on September 16, 2025, and Secured Auto Group paid the price on October 7, 2025. Secured Auto Group listed the Vehicle for sale on October 4, 2025, marked it "Sold" on October 8, 2025, and sold the Vehicle to Luxury Auto Collection, LLC, an Arizona dealer. Ex. 20 (BMWFS-0250–51, 0257–61); Hirahara Decl. ¶ 18 & Ex. H; ECF No. 16 ¶ 22; ECF No. 16-3.

49. On October 22, 2025, BMW's counsel wrote to Secured Auto Group that "Gauge did not purchase the Vehicle from its owner, FSVT and, when Gauge purchased the Vehicle, Gauge was aware of the fraudulent title under which Gauge made its purchase," demanded "the name and address of the person who recently purchased the Vehicle from Secured Auto Group," and warned that a refusal "may reasonably be viewed by my clients as making you and your company complicit in Gauge's improper actions." Ex. 21 (BMWFS-0296–97); RFA Resp. No. 27.

50. The only request BMW has produced for the documents used to obtain the New York title is a public-records request that a BMW FS employee submitted to the New York DMV on September 2, 2025: "Need copies of documents that were used to get NY title issued for VIN SLATV8C0XPU216487 2023 Rolls Royce. Attached is copy of valid ELT record we had for this vehicle. Need these records for our legal department." The New York DMV's Freedom of Information Law Office responded on October 8, 2025. Ex. 22 (BMWFS-0235–41).

51. On October 8, 2025, BMW counterclaimed in this action for a declaration that "the New York Title is invalid and void as a matter of law" and that "FSVT is the Vehicle's rightful owner and lienholder," and for replevin, conversion, unjust enrichment, trespass to chattels, and tortious interference. ECF No. 16 ¶¶ 23, 32–49 & at 11. Gauge answered on October 29, 2025,

pleading, among other defenses, good-faith purchase without notice, estoppel, waiver, laches, and unclean hands. ECF No. 38 at 5–7. On May 4, 2026, the Court granted BMW's motion to dismiss its counterclaims without prejudice under Rule 41(a)(2) and found its motion for a temporary restraining order moot. ECF No. 48. BMW now states that it "do[es] not have active affirmative claims for relief in this lawsuit." Interrog. Ans. No. 15. BMW's Florida action against Gauge, FPC, Blackfire, Mr. Davis, and the Florida DMV remains pending, and no court has adjudicated the validity of the New York title or of Gauge's title. ECF No. 32 at 2; ECF No. 37 at 1–2; ECF No. 48 at 3.

## ARGUMENT

### I. Rule 57 Calls for a Speedy Hearing and a Prompt Declaration.

The Declaratory Judgment Act authorizes this Court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Rule 57 supplies the procedure and adds that "[t]he court may order a speedy hearing of a declaratory-judgment action." Fed. R. Civ. P. 57. The Rule's drafters explained why: a declaratory action "operates frequently as a summary proceeding, justifying docketing the case for early hearing as on a motion," and "[a] declaratory judgment is appropriate when it will 'terminate the controversy' giving rise to the proceeding." Fed. R. Civ. P. 57 advisory committee's note (1937). Summary judgment, in turn, is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In this Circuit, a court deciding whether to hear a declaratory claim considers whether the declaration "would settle the controversy"; whether it "would serve a useful purpose in clarifying

the legal relations at issue"; whether the remedy is being used "merely for the purpose of 'procedural fencing' or 'to provide an arena for a race to res judicata'"; whether it "would increase friction between our federal and state courts and improperly encroach upon state jurisdiction"; and "whether there is an alternative remedy which is better or more effective." *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994); *see also Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1275 (10th Cir. 1989) (declaratory relief is appropriate when it will clarify or settle the legal relations in issue and terminate or afford relief from the uncertainty giving rise to the proceeding). Each consideration favors a prompt declaration here.

*First*, a declaration will settle the controversy. Every claim in both lawsuits—Gauge's claims here and BMW's claims in Florida—reduces to a single question: who owned the Vehicle on March 4, 2025? BMW's own motion to dismiss said so: "The ultimate question in the instant action is the same question that was posed in the previously-filed Florida FPC Lawsuit and is also posed in the pending Florida BMW Lawsuit, namely, who has valid title ownership of the Vehicle." ECF No. 11 at 15. Answer that question and the rest of this dispute falls into place.

*Second*, a declaration will clarify legal relations that are now in a damaging limbo. The Vehicle has passed through the hands of FPC, Gauge (twice), Secured Auto Group, and an Arizona dealer; three states have issued titles for it; and BMW is writing to downstream buyers that Gauge knowingly bought under a "fraudulent title," warning them that they may be viewed as "complicit." Exs. 3–4, 10, 12, 19–21; Ex. 11 ¶¶ 12, 15, 18; SUMF ¶¶ 5, 11, 41, 46–49. BMW's counsel has told Gauge's counsel the same thing: "any purchaser of the vehicle will be subject to, at the very least, litigation." ECF No. 16-2 at 2; SUMF ¶ 44. Until a court declares whether BMW's lease interest survived Gauge's good-faith purchase, no one in that chain can sell the car with

confidence, and Gauge's reputation as a dealer remains under a cloud that BMW has no evidence to justify.

*Third*, there is no procedural fencing. Gauge filed in its home forum, where it is located, where the Vehicle has since been titled by the State of Utah, and where its witnesses and records are. It did so on August 6, 2025—two days before BMW sued anyone. ECF No. 2-1 at 16; ECF No. 16 ¶ 15. BMW, for its part, sued in a second forum, moved to transfer this case there and then withdrew the motion, and counterclaimed here—asking this Court to declare the New York title "void" and FSVT the Vehicle's "rightful owner and lienholder"—before dismissing those counterclaims. ECF Nos. 16, 38, 48; SUMF ¶ 51. BMW thus invoked this Court's declaratory jurisdiction over the very question Gauge now asks the Court to decide. The Court has already noted the concerns raised by BMW's "attempt to pursue the same claims simultaneously in two jurisdictions." ECF No. 37 at 2.

*Fourth*, deciding Gauge's claim will not create friction with the Florida court. The Court's October 28, 2025 order declined to reach the merits of *BMW's* claims while BMW was pressing them in two courts at once. ECF No. 37 at 2–3. BMW has since withdrawn its claims from this Court. ECF No. 48. What remains is Gauge's own claim, brought against defendants who have appeared and litigated here for more than a year. The Florida court has not adjudicated the title question. ECF Nos. 16, 38, 48; SUMF ¶ 51. A declaration here displaces nothing the Florida court has done; it supplies the answer both courts need.

*Fifth*, there is no better remedy. Gauge no longer possesses the Vehicle, so the dispute is not one for replevin. It is a dispute about the legal effect of undisputed events—a lease, a default, a retitling, a purchase—and that is exactly what declaratory relief exists to decide. Because the

material facts come from BMW's own records and admissions, the "summary proceeding" the Rule's drafters envisioned is available: the Court can hear this matter promptly on the papers and argument and, if any genuine factual dispute emerges, resolve it at an expedited hearing on the First Cause of Action. Gauge therefore asks the Court to shorten the twenty-eight-day response period that would otherwise apply, *see* DUCivR 7-1(a)(4), to fourteen days after entry of the Court's order—the period the local rules set for most motions—with any reply due seven days after service of the response, so that the "speedy hearing" the Rule contemplates is not deferred by the default briefing schedule.[4]

## II. The Undisputed Facts Establish That Gauge Purchased the Vehicle in Good Faith, for Value, Without Notice.

Every path to the declaration Gauge seeks runs through the same threshold facts: Gauge gave value, took delivery, and had no knowledge of BMW's claimed interest. None is disputed.

*Value and delivery.* Gauge agreed to pay $310,000 to the record owner shown on a state-issued certificate of title, took delivery of the Vehicle and the title in New York on March 4, 2025, and wired the funds the following day. Ex. 11 ¶¶ 10–11; SUMF ¶ 34. The price was market: BMW's own wholesale valuation six weeks earlier was $303,000, and Gauge resold the Vehicle the same day for $314,000. Ex. 12; Ex. 6 at BMWFS-0089; SUMF ¶ 41. BMW's Counterclaim insinuated that a $4,000 margin was "only" a small profit "on such a unique and valuable vehicle." ECF No. 16 ¶ 9. But that margin is four times what Gauge earns on a typical deal, Ex. 11 ¶¶ 2–3;

[4] Gauge's First Cause of Action (declaratory judgment) and Second Cause of Action (quiet title) are equitable in nature; the Complaint's jury demand is directed to Gauge's damages claim for tortious interference (Fourth Cause of Action). ECF No. 2-1 at 2, ¶¶ 12–20, 26–30. To the extent any genuine question of fact bears on the First Cause of Action, Gauge requests that the Court resolve it at the Rule 57 hearing rather than defer it to a later trial.

SUMF ¶ 32, and Gauge paid $7,000 *more* than BMW's own wholesale valuation. A buyer who pays full value is not a buyer who suspects the goods are tainted.

*Good faith and lack of knowledge.* For a merchant, good faith means "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." N.Y. U.C.C. § 2-103(1)(b); *see also id*. § 1-201(b)(20). Gauge examined the title, matched it against the DMV's own title record, and inspected the car. Ex. 11 ¶¶ 4–9; SUMF ¶ 33. Nothing BMW has identified that Gauge could have checked would have revealed its claim, because BMW had placed nothing anywhere a buyer looks: no lien on the New York title, no notation with the New York DMV, no theft report in any database, no flag in NMVTIS or in the vehicle-history services. Ex. 16, Interrog. Ans. Nos. 4, 6, 10, 12; Ex. 15, RFA Resp. No. 18; SUMF ¶¶ 25–30, 40.

BMW admits that it did not communicate with Gauge before March 4, 2025, and that it is aware of no evidence that Gauge participated in the title fraud that preceded Gauge's purchase; its first written demand to Gauge came on July 25, 2025. Asked to identify any record available to Gauge on March 4, 2025 that would have disclosed its interest, BMW identified only a Florida title that Florida had cancelled six months earlier. Ex. 15, RFA Resp. Nos. 21, 25; ECF No. 16 ¶ 11; Ex. 14; Ex. 16, Interrog. Ans. Nos. 4, 12; Ex. 5; SUMF ¶¶ 36–40, 43.

Asked directly for the facts behind its accusation that Gauge "was aware of the fraudulent title," BMW objected and produced nothing but a complaint filed more than three months after Gauge's purchase. Ex. 21; Ex. 16, Interrog. Ans. No. 11; SUMF ¶¶ 38, 49. BMW's own Counterclaim conceded the point: "it is presently unclear the extent to which Gauge . . . was aware of the secret title-fraud activities," and the only "notice" to Gauge that BMW could identify was that same June 2025 lawsuit. ECF No. 16 ¶ 11; SUMF ¶ 39. Good faith is measured when the buyer

pays and takes delivery, not when a claimant surfaces months later. On this record, Gauge's status as a good-faith purchaser for value without notice is established as a matter of law.

## III. Whatever Label BMW Attaches to Its Interest, the Law Allocates This Loss to BMW, Not to Gauge.

BMW has described its interest in the Vehicle in shifting terms. On the Florida title it is "owner and lienholder." To FPC in April 2025 it was a "lien" securing "financing," and FSVT was "the valid lienholder." To Gauge in July 2025, and in its interrogatory answers here, it is "ownership." In its Counterclaim it was "owner/lessor and lienholder," an interest BMW alleged "was first perfected"—the vocabulary of Article 9, not of ownership. Exs. 3–4, 13–14; Ex. 16, Interrog. Ans. No. 3; ECF No. 16 ¶¶ 7, 32; SUMF ¶¶ 5, 42–44. The label does not change the outcome. Under the certificate-of-title system BMW itself elected to use, under the Uniform Commercial Code's rules for good-faith purchasers, and under settled principles of equity, the loss caused by BMW's lessee and by BMW's own inaction falls on BMW.[5]

### *A. If BMW's interest is a lien or security interest, it was never perfected in New York, and Gauge took free of it.*

BMW protected its interest the way a lender does: it recorded FSVT as lienholder on a Florida electronic title. Exs. 3–4; SUMF ¶ 5. A security interest in a titled vehicle is perfected by having it noted on the certificate of title, and the law of the state whose certificate covers the vehicle governs perfection and its effect. N.Y. U.C.C. §§ 9-303(c), 9-311(a)(2), (b).[6]

[5] Gauge purchased, paid for, and took delivery of the Vehicle and the New York certificate of title in New York, so New York law governs the transfer and the effect of the New York title. *See* N.Y. U.C.C. § 9-303(c). The result does not depend on the choice, because the relevant provisions of the Uniform Commercial Code are the same in New York, Utah, and Florida. Compare N.Y. U.C.C. §§ 2-403(1), 9-316(d)–(e), 9-317(b), with Utah Code Ann. §§ 70A-2-403(1), 70A-9a-316(4)–(5), 70A-9a-317(2), and Fla. Stat. §§ 672.403(1), 679.3161(4)–(5), 679.3171(2).

When a vehicle already subject to a security interest becomes covered by a certificate of title from another state, the Code gives the secured party a grace period and no more: the interest "remains perfected" for a time, but it "becomes unperfected as against a purchaser of the goods for value and is deemed never to have been perfected as against a purchaser of the goods for value" if the secured party does not satisfy the new state's perfection requirements before "the expiration of four months after the goods had become so covered." N.Y. U.C.C. § 9-316(d)–(e). New York's Title Act says the same thing in its own words: a security interest perfected elsewhere "continues perfected in this state for four months after a first certificate of title of the vehicle is issued in this state, and also, thereafter if, within the four month period, it is perfected in this state." N.Y. Veh. & Traf. Law § 2118(c)(2)(B). That provision, rather than its companion for liens still shown on a "currently effective" out-of-state certificate, id. § 2118(c)(2)(A), is the one that applies here, because Florida cancelled FSVT's certificate on August 29, 2024. And a buyer of goods who "gives value and receives delivery of the collateral without knowledge of the security interest . . . and before it is perfected" takes free of it. N.Y. U.C.C. § 9-317(b).

The dates are not in dispute. New York issued its certificate of title for the Vehicle on August 27, 2024; Florida cancelled FSVT's title two days later. Ex. 10; Ex. 9; Ex. 5; SUMF ¶¶ 11–12. The four-month period ended no later than December 27, 2024. In that window—and in the ten weeks that followed before Gauge bought the car—BMW delivered nothing to the New York DMV: no application to note its lien, no notice of lien, no certificate, nothing. Its only contacts with

[6] The New York Title Act likewise provides that a security interest in a titled vehicle "is not valid against . . . subsequent transferees . . . of the vehicle without knowledge of the security interest unless perfected as provided in this section," and that perfection is accomplished "[b]y the delivery to the commissioner of . . . the existing certificate of title, if any, an application for a certificate of title containing the name and address of the lienholder and the required fee." N.Y. Veh. & Traf. Law § 2118(a), (b)(1)(A).

New York's DMV were two form letters dated January 7, 2025—after the four months had already run—one describing FSVT as "the lienholder" and asking for "receipts of titling and registration . . . for a claim," the other describing FSVT as "the Owner" and authorizing an employee "to correct or duplicate the title," an authorization BMW has not shown it ever used. Neither was an application to note a lien. Ex. 23; Ex. 16, Interrog. Ans. Nos. 4, 6; SUMF ¶¶ 27–29. BMW was still reciting "Electronic Lien Verified" in its own file in December 2024, more than three months after Florida had cancelled the title on which that lien was recorded. Ex. 5; Ex. 6 at BMWFS-0091, 0101; SUMF ¶¶ 12–13.

By operation of the statute, BMW's security interest was therefore "deemed never to have been perfected" as against Gauge, a purchaser for value; and Gauge, having given value and taken delivery without knowledge of the interest, took the Vehicle free of it. N.Y. U.C.C. §§ 9-316(e), 9-317(b). BMW's own pleading framed the question in the same terms: its interest, it alleged, "was first perfected." ECF No. 16 ¶ 32; SUMF ¶ 44. Perfection is the right question, and the statute answers it.

BMW cannot avoid this result by denying that the Vehicle became "covered" by the New York title. The Code's test is mechanical: goods "become covered by a certificate of title when a valid application for the certificate of title and the applicable fee are delivered to the appropriate authority." N.Y. U.C.C. § 9-303(b). New York received an application, issued a certificate, and carries Calderon as owner of record; Florida recognized the New York title and cancelled its own; and BMW itself obtained "an electronic copy of the title from NY" and describes it under oath as "an active title." Ex. 5; Ex. 6 at BMWFS-0088; Ex. 16, Interrog. Ans. Nos. 8–9; SUMF ¶¶ 12, 23, 31. Nor does it matter that the application rested on a forged Florida document. The four-month

rule exists precisely for the case in which a lienholder's interest has been dropped from a new state's title—by fraud, by mistake, or by a clerk's error—and it tells the lienholder what to do: re-perfect within four months or yield to purchasers for value. BMW had every tool it needed. It had located the Vehicle in New York in September 2024, identified Calderon in October, and confirmed the New York title in December. Ex. 6 at BMWFS-0096–97; Ex. 6 at BMWFS-0095; Ex. 8 at BMWFS-0198; Ex. 6 at BMWFS-0090; Ex. 16, Interrog. Ans. Nos. 7–8; SUMF ¶¶ 14–15, 19–20. It chose instead to "suspend[] repossession services" and to "beg[i]n efforts to retake title" by ordering records. Ex. 16, Interrog. Ans. Nos. 8–9; SUMF ¶ 31. The statute assigns the consequence of that choice to BMW.

***B. If BMW's interest is "ownership" under a true lease, the result is the same.***

BMW now prefers to call itself an "owner," reasoning that a lessee has no title and therefore no one downstream can have any. Ex. 14; Ex. 16, Interrog. Ans. No. 3; ECF No. 16 ¶¶ 7, 32; ECF Nos. 16-1, 16-2; Ex. 18 ¶¶ 42, 58; SUMF ¶¶ 43–44. The premise does not fit the facts, and the conclusion does not follow from the law.

**1. *BMW voluntarily delivered the Vehicle in a "transaction of purchase," and the Code protects a good-faith purchaser against the claim that the delivery was procured by fraud.*** The Code draws a line between goods that are stolen and goods that their owner voluntarily hands over. "A person with voidable title has power to transfer a good title to a good faith purchaser for value," and "[w]hen goods have been delivered under a transaction of purchase the purchaser has such power even though . . . (d) the delivery was procured through fraud punishable as larcenous under the criminal law." N.Y. U.C.C. § 2-403(1). A "purchase" includes "taking by sale, lease, . . . or any other voluntary transaction creating an interest in property." Id. § 1-201(b)(29).

This Vehicle was not stolen from BMW. BMW delivered it—voluntarily, for $193,033.69 down and a promise of $4,000 a month—to a lessee it had already flagged for "limited verifiable wealth and late payments," in a transaction the Code defines as a purchase. Ex. 1; Ex. 2; SUMF ¶¶ 1, 4. BMW's own pleading alleges, on information and belief, that "Blackfire and Davis directly or indirectly caused the Vehicle's transfer to Manuel Calderon and/or Steven J. Calderon." Ex. 16, Interrog. Ans. No. 3; ECF No. 16 ¶¶ 7, 32; ECF Nos. 16-1, 16-2; Ex. 18 ¶¶ 42, 58; SUMF ¶ 44. The chain of possession thus runs from BMW's voluntary delivery to its chosen counterparty, and from that counterparty to the seller from whom Gauge bought. If BMW's lessee obtained or kept the Vehicle by fraud—and BMW's own collectors thought so as early as August 2024, Ex. 6 at BMWFS-0105; Ex. 6 at BMWFS-0099–0105; SUMF ¶¶ 8–9—that is exactly the situation § 2-403(1)(d) addresses: the owner who parted with possession by its own act bears the risk of its transferee's fraud as against a good-faith purchaser for value. The forged Florida document later presented in New York does not convert BMW's voluntary delivery into a theft. The question under § 2-403 is how the goods left the owner's hands, not what paperwork a later wrongdoer used, and the answer is that BMW handed them over.

**2. *The certificate-of-title system BMW relies on treats the New York title as valid until the Commissioner says otherwise, and BMW never asked.*** New York's Title Act provides that "[a] certificate of title issued by the commissioner is prima facie evidence of the facts appearing on it." N.Y. Veh. & Traf. Law § 2108(c). The Act also supplies the mechanism for undoing a certificate that was "fraudulently procured or erroneously issued": the Commissioner "shall suspend or revoke" it "upon notice and reasonable opportunity to be heard," and may suspend it temporarily while the hearing is pending. Id. § 2124(a)(1), (e). That process protects everyone with a stake in

the public record, including purchasers who rely on it. BMW knew by December 18, 2024 that New York had issued a clean title; it had the electronic certificate in hand by February 12, 2025. Ex. 8 at BMWFS-0195–0200; Ex. 6 at BMWFS-0088, 0090; SUMF ¶¶ 19–23. It has identified no request to the Commissioner to suspend the title; its only communications with the New York DMV were a request for records and an internal authorization form that BMW has not shown it ever acted on, Ex. 23; Ex. 16, Interrog. Ans. Nos. 4, 6; SUMF ¶¶ 27–29; and it did not ask the DMV for "copies of documents that were used to get NY title issued" until September 2, 2025, six months after Gauge's purchase, Ex. 22; SUMF ¶ 50.

It admits that it is aware of no court or agency that had declared the New York title invalid or void as of March 4, 2025, and its own sworn answers call it "an active title." Ex. 15, RFA Resp. No. 18; Ex. 16, Interrog. Ans. Nos. 8–9; SUMF ¶¶ 30–31. On the day Gauge bought the Vehicle, then, the State of New York's official record said that Steven J. Calderon owned it free of liens, and no proceeding anywhere said otherwise. Five months later a second state, Utah, examined the chain of title and issued its own certificate to Gauge, again showing no lienholder. Ex. 19; SUMF ¶ 47. A private party cannot nullify two states' certificates of title by writing letters after the fact, and a buyer who paid full value in reliance on the public record cannot be charged with a defect that the responsible agency has never found.

**3. *BMW's own conduct treats its interest as a financial one.*** BMW's "ownership" theory also sits uneasily with how BMW has behaved. It has never charged off the Blackfire account, never made an insurance or fraud-loss claim, and never claimed a residual-value loss; it continued to bill its lessee $4,000 a month for a car it now says was stolen from it; and its recovery notes measure the Vehicle by "payoff" and "MMR," the vocabulary of a lender's collateral rather than an

owner's chattel. Ex. 12; Ex. 6 at BMWFS-0089; Ex. 16, Interrog. Ans. No. 17; Ex. 7; SUMF ¶¶ 41, 45. Its first written assertion of its claim, in April 2025, called the interest a "lien" securing "financing." Ex. 13; SUMF ¶ 42. And when the Vehicle was about to be resold in October 2025, BMW's proposal was not that the car be returned to its "owner" but that Gauge sell it and deposit "[t]he funds of the sale" with a court—the posture of a creditor looking to a fund, not of an owner reclaiming its property. ECF No. 16-1 at 2; SUMF ¶ 44. Whatever its internal accounting, BMW elected to protect its interest through the certificate-of-title lien system and to pursue the remedies of a financier. It must accept the rules of that system, including the rule that a lien dropped from a new state's title must be re-perfected within four months or yield to purchasers for value.

### ***C. Equity independently bars BMW's claim against Gauge.***

Even if some residue of BMW's interest survived the statutes, equity would not permit BMW to enforce it against Gauge. The principle is old and simple: as between two innocent parties, the loss falls on the one whose conduct made it possible. BMW is not merely the party whose conduct made this loss possible; it is the party that, at every turn, chose not to prevent it.

Consider what BMW knew, and when. It knew its lessee was a credit risk when it wrote the Lease. Ex. 2; SUMF ¶ 4. It knew by August 8, 2024 that the lessee was, in its own words, "involved in [a] fraud scheme." Ex. 6 at BMWFS-0105; SUMF ¶ 8. It knew by September 25, 2024 exactly where the Vehicle was—in a garage on Cook Avenue in Yonkers—and by October 2, 2024 who had it. Ex. 6 at BMWFS-0095–97; SUMF ¶¶ 14–15. Its Lease authorized it to take possession by any lawful method, and it had repossession approved. Ex. 1 at BMWFS-0006, 0008; Ex. 6 at BMWFS-0099–0105; Ex. 6 at BMWFS-0089, 0091; SUMF ¶¶ 3, 9, 17. It did not act. It knew by December 18, 2024, from the State Police, that New York had issued a clean title to "a known

fraudster," and it confirmed that fact the same day. Ex. 8 at BMWFS-0198; Ex. 6 at BMWFS-0090; Ex. 16, Interrog. Ans. Nos. 7–8; SUMF ¶¶ 19–20. It did not act.

On January 6, 2025, the State Police told it what to do—"write it on a letterhead, requesting that the vehicle be reported stolen"—and BMW answered: "We do not have any issues with reporting this vehicle stolen if that is needed for your investigation." Ex. 8 at BMWFS-0195–96; SUMF ¶ 22. It sent no letter. Ten days later it handed the file to its legal department. Id. It was told again on February 19, 2025, this time by the NYPD, that the Vehicle would be marked stolen and picked up if BMW would simply send a letter. Ex. 6 at BMWFS-0088; SUMF ¶ 24. It referred the matter to counsel and closed its recovery case. Id. Its letter to the NYPD is dated February 25, 2025 —seven weeks after the State Police's invitation and seven days before Gauge bought the car—and BMW has identified no theft flag, lien notation, or public notice of any kind that existed on March 4, 2025. Ex. 9; Ex. 16, Interrog. Ans. No. 10; SUMF ¶¶ 25–26.

BMW's explanation—that it "could not repossess" because an "active title" existed without its name on it, Ex. 16, Interrog. Ans. Nos. 8–9; SUMF ¶ 31—is a concession, not a defense. A titled owner or lienholder that learns its vehicle has been retitled to a stranger has remedies: take possession under the lease, report the theft it now alleges, ask the issuing state to suspend the title, note its lien, or sue. BMW invoked none of them in the six months between the New York title and Gauge's purchase. When it later pleaded its case here, BMW alleged that it "discovered" the fraudulent retitling "on or about April 2025," ECF No. 16 ¶ 2; its own records and sworn answers put the date at December 18, 2024, Ex. 8 at BMWFS-0198; Ex. 6 at BMWFS-0090; Ex. 16, Interrog. Ans. Nos. 7–8; SUMF ¶¶ 19–20. The gap between those dates is the period in which the Vehicle sat in the stream of commerce wearing a clean title, and BMW knew it. Gauge, by contrast,

knew nothing, could have learned nothing, and paid full value. To shift BMW's loss onto Gauge would reward the party that slept on its rights and punish the party that did everything the law asks of a buyer. Equity does not permit that result, whether the doctrine invoked is estoppel, laches, or simply the maxim that the law protects the vigilant and not the negligent.

### *D. The declaration should extend to Gauge's transferees.*

A declaration that Gauge acquired good title necessarily means that Gauge's transfers of that title were rightful, because a purchaser "acquires all title which his transferor had or had power to transfer." N.Y. U.C.C. § 2-403(1). The Court's declaration should say so expressly. BMW's letters to downstream purchasers are the mechanism by which this controversy keeps spreading, Ex. 21; Ex. 16, Interrog. Ans. No. 11; SUMF ¶¶ 38, 49, and a declaration that stopped at Gauge would leave FPC, Secured Auto Group, and every later buyer exposed to the same letters and the same threats. That would not "terminate the controversy," as Rule 57 intends.

## CONCLUSION

The record answers the only question in this case, and it answers it with BMW's own documents. BMW chose its lessee, delivered the Vehicle, found it when it went missing, learned of the clean title, was offered the police's help, and declined every opportunity to protect its interest in a way a buyer could see. Gauge did what the law asks of a purchaser and paid full value for a car that the State of New York said was free and clear. The Court should set Gauge's First Cause of Action for a speedy hearing under Rule 57 and, upon that hearing, enter judgment declaring that Gauge acquired good title to the Vehicle on March 4, 2025, free of any interest of BMW FS or FSVT; that Gauge's subsequent transfers conveyed good title; and that BMW may not enforce

against Gauge any remedy for the Blackfire default or the fraudulent retitling of the Vehicle. A proposed order is submitted with this motion.

DATED this 25th day of September, 2026.

**KNH LLP**

*/s/ Chad Pehrson*
Chad Pehrson
Nathan Gardner
*Attorneys for Plaintiff Gauge Automotive, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of September, 2026, I caused a true and correct copy of the foregoing **PLAINTIFF'S MOTION FOR A SPEEDY HEARING AND DECLARATORY JUDGMENT UNDER FED. R. CIV. P. 57, AND FOR SUMMARY JUDGMENT ON ITS FIRST CAUSE OF ACTION UNDER FED. R. CIV. P. 56**, together with the Appendix of Evidence, to be filed electronically through the Court's CM/ECF system, which sent notice of the filing to the following:

William S. Helfand
Andrew J. Schuman
LEWIS BRISBOIS BISGAARD & SMITH LLP
6550 South Millrock Drive, Suite 200
Salt Lake City, Utah 84121-2319
Bill.Helfand@lewisbrisbois.com
Andrew.Schuman@lewisbrisbois.com
*Attorneys for Defendants BMW Financial Services NA, LLC and Financial Services Vehicle Trust*

*/s/ Nathan Gardner*